T.C. Memo. 1998-6


UNITED STATES TAX COURT


UTAH JOJOBA I RESEARCH, WILLIAM G. KELLEN,
TAX MATTERS PARTNER,[1] Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7619-90.                    Filed January 5, 1998.


Frederick R. Schumacher, for petitioner.

Rodney J. Bartlett and Brian M. Harrington, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge:  This case was assigned to Special Trial
Judge Norman H. Wolfe pursuant to the provisions of section

---

[1]    There are at present 18 other docketed cases that are bound
by stipulation by the outcome of this case.

7443A(b)(4) and Rules 180, 181, and 183.[2]  The Court agrees with
and adopts the opinion of the Special Trial Judge, which is set
forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge:  Utah Jojoba I Research (Utah I)
is a limited partnership organized under the laws of California.
The provisions of sections 6221-6233 (the TEFRA partnership
provisions)[3] are applicable to Utah I.  By notice of final
partnership administrative adjustment (FPAA) respondent
determined the following adjustments to the partnership return of
income of Utah I:  (1) Disallowance of a claimed loss for 1982 in
the amount of $1,304,819, including $1,298,627 claimed as
qualified research and experimental expenditures under section
174; and (2) disallowance of a claimed loss of $50,482 for 1983.
William G. Kellen (Kellen), as tax matters partner (TMP), timely
filed a petition with this Court.

We must decide whether the Utah I partnership is entitled to
the claimed deductions for losses for 1982 and 1983 and
particularly whether Utah I is entitled to treat amounts

---

[2]    All section references are to the Internal Revenue Code in
effect for the tax years in issue, except as otherwise indicated.
All Rule references are to the Tax Court Rules of Practice and
Procedure.

[3]    The so-called TEFRA partnership provisions, secs. 6221-6233,
were added to the Code by the Tax Equity and Fiscal
Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a),
96 Stat. 648.

allegedly paid or incurred for research and experimental expenditures as deductible trade or business expenses.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

The jojoba plant is a shrub that is generally found on the periphery of the Sonora Desert.  While classified as a member of the boxwood family, it is not closely related to any other plant. .  The jojoba plant produces a seed, sometimes referred to as a bean, that contains approximately 50 percent by weight of an unusual oil.  Jojoba oil is actually a liquid wax ester, unlike the triglyceride oils typically produced by plants, and is similar to sperm whale oil.

It takes 5 years or more for a jojoba plant to produce seeds in a harvestable quantity.  Jojoba oil is useful for a variety of products, ranging from cosmetics to industrial lubricants.

The ban in 1971 on the importation of sperm whale oil stimulated an interest in the commercial production of jojoba oil.  In 1978, an estimated 2,200 acres of jojoba were planted in Arizona and California.  At that time, it had been estimated that 25,000 acres of jojoba would be sufficient to replace the sperm

whale oil requirements of the United States. By 1982, the planted jojoba acreage had increased more than 10 times to an estimated 25,000 acres, and by 1986 an estimated 40,000 acres of jojoba had been planted in Arizona, California, and Texas.

Utah I entered into an agreement with U.S. Agri Research and Development Corp. (U.S. Agri) that purported to provide for U.S. Agri to furnish agricultural research and development services with respect to the growing of jojoba on land in Desert Center, California (the plantation). Utah I engaged in no activity other than to enter into the agreements described herein and transmit payments to U.S. Agri.

1.  Utah Jojoba I Research

When the petition was filed, the principal place of business of Utah I was Cora, Wyoming.

On December 27, 1982, Utah I was organized as a limited partnership with a described purpose of conducting research and development involving the jojoba plant. Kellen served as both the general partner and TMP of Utah I. Under the accrual method of accounting and pursuant to a claimed election under section 174, Utah I claimed losses of $1,304,819 for 1982, largely from the deduction of $1,298,627 as research and experimental expenses for the taxable year ending on December 31, 1982, and also claimed losses of $50,482 for the taxable year ending

December 31, 1983.  However, no activity under the research and development (R&D) agreement occurred prior to December 31, 1982.

In 1982, Kellen worked primarily as an attorney and a bank executive in the Fontana and Riverside areas of California.  In October 1982, Kellen was introduced by Eugene Pace (Pace), a former neighbor and casual business acquaintance, to Coordinated Financial Services (CFS) of Salt Lake City, Utah.  CFS and Pace represented a group of investors who were seeking someone to serve as the general partner for a limited partnership with a described purpose of conducting research and development of the jojoba plant and its product, the jojoba nut (or bean).  Pace suggested to CFS that Kellen would be a suitable general partner for the jojoba limited partnership.

Prior to his formation of U.S. Agri, discussed infra, Pace was a financial planner.  In 1968 Pace simultaneously formed Gemini Financial Corp. (Gemini) and a brokerage/dealership called GFCS, Inc.  Through Gemini, Pace marketed life insurance and securities in various forms.  Gemini was also involved in the promotion of syndications as tax-advantaged investments in the form of limited partnerships.  Among the many syndications organized by Gemini were those involving investments in an orange grove, apartment units, shopping centers, and egg-laying hens.

At Pace's suggestion, Kellen traveled to Salt Lake City, Utah, to interview with members of CFS regarding the general

partner position.  In November 1982, CFS notified Kellen that he had been selected to serve as the general partner of Utah I. Shortly thereafter, CFS notified Kellen that the investing group intended to form three additional jojoba limited partnerships and asked Kellen if he would serve as the general partner for these additional limited partnerships.  Kellen agreed and became the general partner of four jojoba research and development limited partnerships, including Utah I.  When he became general partner in 1982, Kellen had no prior experience in the growing of jojoba. At that time, Kellen's knowledge of jojoba was limited to articles he read in National Geographic and his familiarity to some extent with the experimental jojoba plantations located at the University of California at Riverside.

Kellen and Pace had known each other since 1975.  Then Pace owned a 96-acre orange grove located across the street from Kellen's residence in Riverside, California.  Pace wished to develop the orange grove through a syndication.  After learning that Kellen was a civil engineer as well as an attorney, Pace engaged Kellen to assist him in subdividing the land.  Kellen successfully completed the subdivision of Pace's land in approximately 1979.  Pleased with Kellen's handling of the sale of the orange grove, Pace remained in contact with Kellen after the sale was completed.

The next joint business activity by Kellen and Pace occurred either in late 1979 or early 1980 when Pace asked Kellen for assistance in locating desert property with a good water supply that would be suitable for growing jojoba. Kellen directed Pace to land located in Desert Center and Blythe, California, which had an unlimited water supply for agricultural purposes. Since 1974 Kellen had been actively involved in efforts to develop the land in this area agriculturally. According to Kellen, he was actively involved in the development of alfalfa, citrus, jojoba, grapes, and asparagus. Nevertheless, the private placement memorandum used to promote Utah I characterized Kellen as having "no previous experience" with respect to jojoba beans. The maximum amount of land that Kellen owned at any one time in the Desert Center and Blythe areas was 4,000 to 6,000 acres.

Pace was pleased with the characteristics of the land Kellen showed him in Desert Center, California, and thought it would be a good location for growing jojoba. In 1980, the Sterling Trust, which had been established by Pace, purchased 400 acres of property in Desert Center, California. The Sterling Trust was an inter vivos trust in which Pace was both the grantor and the beneficiary. At trial, Pace was not able to recall the name of the individual who sold the property to the Sterling Trust. Kellen served and continues to serve as trustee of the Sterling Trust. Kellen also served as a director of U.S. Agri before he

became general partner of jojoba farming partnerships. In 1981, the Sterling Trust leased the 400 acres it owned to U.S. Agri (described infra) for jojoba farming operations. The 80 acres later allocated to Utah I were included in the 400 acres leased to U.S. Agri.

Utah I was financed through a private placement, as described infra. The operation was conducted by U.S. Agri, purportedly with management and supervision by Agri Futures, Inc.

Kellen frequently made the 120-mile trip from his office to Desert Center to inspect the land allocated to Utah I. As general partner, Kellen received quarterly progress reports in the form of correspondence from Pace on behalf of U.S. Agri regarding the progress on the jojoba plantation. On October 23, 1983, Kellen forwarded one of the progress reports he received from U.S. Agri regarding the growth of the jojoba plants to Utah I's limited partners. Although Kellen received additional progress reports from Pace on behalf of U.S. Agri during 1984, he did not forward any of these reports to the limited partners of Utah I. On February 14, 1985, Kellen forwarded two additional progress reports from Pace on behalf of U.S. Agri to the limited partners of Utah I.

Pace believed that Utah I's research contract with U.S. Agri terminated after 4 years, on approximately December 31, 1986. However, by its literal terms, the R&D agreement expired upon

Utah I's execution of the license agreement described in paragraph 10.a of the R&D agreement. This license agreement was executed by Kellen on December 31, 1982, concurrently with Kellen's execution of the R&D agreement. Kellen testified at trial that he did not read the private placement memorandum for Utah I, which included the R&D agreement and the license agreement, before signing them on December 31, 1982, and that after signing the documents he gave "No thought to the license agreement whatsoever."

By 1986, U.S. Agri had not been successful in developing a method to "harden off" the jojoba plants cultured in the laboratory and grown in a greenhouse test tube. According to Pace, the process of hardening off jojoba plants refers to the technique of taking a jojoba plant grown in a greenhouse test tube and successfully planting it in the ground. As a result, a high percentage of the cultured jojoba plants died after they were planted in the ground. In 1987, when Pace decided to close U.S. Agri's laboratory and greenhouse and stop all research activity, U.S. Agri was still experiencing a 90-percent failure rate for the cultured jojoba plants transferred to the field. Soon after, in late 1987, U.S. Agri integrated the 80 acres allocated to Utah I with the rest of its commercial jojoba farming operation.

Kellen testified that passage of the Tax Reform Act of 1986, which required passive investors to capitalize all preproduction costs, ultimately contributed to the failure of Utah I. Kellen explained that "with the collapse, basically, of the tax incentive for doing jojoba, we had to then go into some type of other mode of operation to see if we couldn't make the venture profitable." In October 1991, Utah I was consolidated with 36 other limited partnerships under contract with U.S. Agri into one large limited partnership, Jojoba Plantation Ltd. The general partners of the 37 limited partnerships believed that by combining resources they could reduce costs and enable their jojoba farming ventures to become profitable. At the time of the trial of this case, Jojoba Plantation Ltd. was in chapter 7 bankruptcy.

### a. The Private Placement Memorandum

Coordinated Financial Services (CFS) prepared the private placement memorandum (the offering) and all other organizational and contractual documents for Utah I, including the R&D agreement and the license agreement. Although Kellen, as general partner of Utah I, properly executed the documents, he claims that he did not carefully review any of the documents prepared by CFS before subscriptions were taken for Utah I. The offering, dated November 10, 1982, provided for a maximum capitalization of $2,968,000 consisting of 350 limited partnership units, at $8,480

per unit.  Each unit consisted of a cash downpayment of $2,500 and a non-interest-bearing promissory note in the principal amount of $5,980 payable in 10 annual installments with an acceleration provision in case of default.  Subscription agreements, which included the promissory note, were signed by each limited partner and obliged him to make these payments. Kellen never took any action in a State or Federal court to enforce the promissory notes against the limited partners of Utah I who defaulted.  The offering was limited to investors with a net worth (exclusive of home, furnishings, and automobiles) of $150,000, or investors whose net worth was $50,000 (exclusive of home, furnishings, and automobiles) and who anticipated that for the taxable year of the investment they would have gross income equal to $65,000, or taxable income, a portion of which, but for tax-advantaged investments, would be subject to a Federal income tax rate of 50 percent.  Each limited partner also was required to execute a limited guaranty agreement in which he guaranteed a proportionate share of partnership debt to U.S. Agri.  The Utah I partnership was formed with subscriptions for 247 units for a total capitalization of $2,094,560, which facilitated farming operations on 80 acres of real property located in the environs of Desert Center, California, for a period of approximately 4 years.

According to the offering circular, Utah I was to be "formed to undertake a comprehensive research and development program on the plant Simmondsia Chinensis (Jojoba)," and, ultimately obtain production from the plantation property allocated to Utah I. The offering identified U.S. Agri as the contractor selected to carry out the research and development program under an R&D agreement.

b.  U.S. Agri

U.S. Agri was a Nevada corporation established by Pace on November 7, 1979.  Prior to 1979, Pace was not familiar with jojoba.  Pace was the sole shareholder of U.S. Agri and also served as the chief executive officer.  Pace delayed activating U.S. Agri until the summer of 1981 so he could learn more about the jojoba business before committing to participation in the business.  For 4 or 5 months in 1981, Kellen served as an officer and director of U.S. Agri.

U.S. Agri leased, with an option to buy, 1,306 acres of land in Desert Center and Blythe, California.  U.S. Agri allocated 400 of those acres located in Desert Center to research and development partnerships.  The other 906 acres were utilized for U.S. Agri's commercial jojoba farming operations.  The 400 acres that U.S. Agri allocated to research and development partnerships

were leased from the Sterling Trust.[4] In 1981, U.S. Agri began making leasehold payments to the Sterling Trust for this land, including the 80 acres that Utah I would later comprise.

U.S. Agri was only nominally capitalized before the summer of 1981, and thereafter was capitalized with $200,000 cash invested by Pace. As part of the capitalization of U.S. Agri, Pace also became obligated on a $150,000 note and deed of trust for the initial 400 acres that had been purchased by the Sterling Trust and leased to U.S. Agri. Funds paid for subscriptions to Utah I subsequently were used to pay for or reimburse U.S. Agri for costs associated with tilling and leveling the land, planting jojoba, purchasing and installing the irrigation system, and otherwise developing Utah I's 80-acre jojoba plantation.

In March 1982, U.S. Agri opened a laboratory and a greenhouse in Riverside, California. Pace alleges that the day-to-day management of the greenhouse was handled by Pace's parents. Pace claims to have hired Dr. Prem Jauhar and Dr. Joyce Clark to set up and run the laboratory. Other technical personnel Pace claims to have employed to perform research for U.S. Agri in the lab and greenhouse include Dr. Meena Moses, Dr. Fen Lin, Dr. Duncan Williams, and Dr. Steven Koenisberg. None of the above-named technical personnel from U.S. Agri testified at

---

[4] There is no information in the record regarding the ownership of the remaining 906 acres of land leased by U.S. Agri.

the trial. Additionally, no evidence was introduced at the trial to substantiate Pace's testimony regarding their actual employment by U.S. Agri.

Sometime between 1979 and 1981, U.S. Agri allegedly entered into a management contract with Agri Futures, Inc. (Agri Futures), a California company. Under this contract, Agri Futures purportedly was to develop the 400 acres U.S. Agri leased from the Sterling Trust, including the land allocated to Utah I, into jojoba plantations. Agri Futures was also known as American Jojoba Industries. U.S. Agri's management contract with Agri Futures is not part of the record in this case.

The sole shareholders of Agri Futures, Gordon Fisher and Bill Rivers, also served as officers and directors of U.S. Agri. As U.S. Agri's subcontractor, Agri Futures provided the physical labor involved in the preparation of the land for farming jojoba and the maintenance of the jojoba plantations. Pursuant to its management contract with U.S. Agri, Agri Futures purportedly planted, maintained, and irrigated the jojoba on the land allocated to Utah I. Pace testified that employees of Agri Futures performed all of the work for Utah I that was necessary to follow the plan he developed for Utah I. Funding for these activities was provided by U.S. Agri pursuant to its arrangements with Utah I, described infra. No one from Agri Futures testified at the trial.

Throughout the entire time that Pace operated U.S. Agri, he was a member of the International Jojoba Association. As a member of the International Jojoba Association, Pace participated in the association's drive to increase the overall annual size of the jojoba crop in order to have a readily available source of supply at a reasonable yet profitable price. These efforts may have included the sharing of information regarding field tests among growers of jojoba.

In the late summer or early fall of 1982, U.S. Agri produced a videotape primarily aimed at potential general partners for jojoba limited partnerships that described jojoba as "liquid gold" and "the industrial crop of the future". Pace testified that this videotape was distributed to 400-500 people in the financial planning community. Additionally, each general partner of the 12 jojoba research and development limited partnerships serviced by U.S. Agri received a copy of the videotape.

According to Pace, his ultimate objective in establishing U.S. Agri, the laboratory, and the greenhouse, in addition to acquiring the 400 acres in Desert Center, was "to develop two or three dozen super hybrid jojoba plants that could be cloned and/or xeroxed, if you will, by virtue of the techniques developed in the lab, for sale to other growers." According to Pace, the land in Desert Center was necessary in order to be able to identify which of the jojoba plants cultured in the lab would

actually grow into superior plants that then could be sold to other growers. However, none of the work done in the laboratory or greenhouse was specifically designated for Utah I. U.S. Agri did not allocate any of its losses from its laboratory and greenhouse operations to Utah I.

U.S. Agri's failure to develop a successful technique for hardening off the jojoba plants cultured in the laboratory and passage of the Tax Reform Act of 1986 forced Pace to close U.S. Agri's laboratory and greenhouse in October or November 1987. As a result, the 400 acres of land that U.S. Agri allegedly had allocated to research and development, including the land allocated to Utah I, was added to the 906 acres that U.S. Agri already was operating as a commercial jojoba farming operation.

By 1991, U.S. Agri serviced 37 different limited partnerships that eventually merged into Jojoba Plantation Ltd. Twelve of these limited partnerships were being serviced pursuant to agreements similar to the agreement between Utah I and U.S. Agri.

c. The Research and Development Agreement

U.S. Agri executed an exclusive R&D agreement with Utah I on December 31, 1982, for the stated purpose of "conducting research and experimentation on the jojoba plant and developing the technology resulting in the commercial cultivation of the jojoba plant." No other bids were considered for the role of prime

research contractor.  The R&D agreement, along with other documents, was sent by CFS to Kellen at his law office on December 31, 1982, in a last minute rush to execute and file the documents before the end of the year.  Pursuant to directions Kellen received from CFS, he notified the notary at his law office to be on "standby" and waited for the courier to arrive with the documents.  Upon the arrival of the courier, Kellen quickly signed the documents and had them notarized before returning them to the courier.

The terms of the R&D agreement entered into between U.S. Agri and Utah I specified that U.S. Agri was "to use its best efforts to develop a jojoba plantation in the vicinity of Desert Center, California, at a specific location to be selected by * * * [U.S. Agri] to be used to conduct research on the domestication, commercial cultivation, planting and irrigation techniques, weed, disease and insect management, and harvesting of the jojoba plant.  Said plantation to be eighty (80) acres." The 80 acres was further described in the R&D agreement as follows:

> The plantation will be located within the larger tract of land described as follows: the Southeast quarter of the Northwest quarter and the Southwest quarter of Section 16, Township 5 South, Range 16 East, San Bernardino Base and Meridan.

Under the R&D agreement, Utah I agreed to pay U.S. Agri a total of $1,298,627, plus interest, $423,428.52 of which was to

be paid with the execution of the R&D agreement. Subsequent installments of nine payments of $121,941 each, including interest on the unpaid balance at the rate of 7 percent, were to be paid annually starting on July 31, 1983. The final sum of $232,921 representing the balance of the payments at 7 percent and 2 percent of deferred interest not previously paid was to be paid on July 31, 1992. The record does not include evidence concerning actual payment of any of these amounts except for Utah I's 1982 and 1983 tax returns and Pace's testimony that he recovered the amounts he advanced to start U.S. Agri from Utah I funds.

The R&D agreement also specified that U.S. Agri was entitled to "retain any and all amounts paid to it by the Partnership * * * [Utah I], whether or not the R&D Program is successful and accomplishes the results contemplated hereunder. * * * [U.S. Agri] does not guarantee that its work will be successful and the Partnership * * * [Utah I] shall have no rights of refund." The R&D agreement further provided that "Any real property and tangible personal property acquired or improved" by U.S. Agri in connection with the research and development program was to remain U.S. Agri's sole property and that "no ownership rights in such property will be transferred to the partnership * * * [Utah I]." The R&D agreement also stated that no income from the jojoba plantation was anticipated during the research and

development period.  If any income were generated during the R&D period, it would "be divided eighty-five percent (85%) to the Partnership * * * [Utah I] and fifteen percent (15%) to the Contractor * * * [U.S. Agri]."

As part of the R&D agreement, Utah I also had the option of requiring U.S. Agri to enter into a license agreement that would include the commercial exploitation of the jojoba plantation assigned to it.  The option, which referred to U.S. Agri as the contractor and Utah I as the partnership, was described as follows:

> At such time as the Jojoba plantation on which the research and development is being conducted has reached a stage of commercial development, the Contractor * * * shall give the Partnership a written report to that effect and the Partnership will have the option to require the Contractor to enter into a License Agreement for the purpose of commercially exploiting the technology developed pursuant to this Agreement.  * * *  This option shall be solely at the discretion of the Partnership.

Execution of the license agreement by Utah I, pursuant to this option, would result in the automatic termination of the R&D agreement between Utah I and U.S. Agri according to the terms of the R&D agreement.

The R&D agreement gave Utah I the ownership of "any inventions, discoveries, improvements, devices, designs, apparatus, practices, processes, methods or products, * * * whether patentable or not, made, developed, perfected, devised, conceived" in the course of U.S. Agri's work for Utah I.  U.S.

Agri did not develop any proprietary technology with respect to or for Utah I. U.S. Agri did present four pages of an incomplete patent application that had been prepared with respect to a tissue culture process. However, this application was never filed or completed, nor did it concern Utah I.

### d. The License Agreement

Concurrently with the execution of the R&D agreement between Utah I and U.S. Agri, on December 31, 1982, Kellen, on behalf of Utah I, executed an exclusive license agreement with U.S. Agri. The license agreement granted U.S. Agri for 40 years "the exclusive right to utilize the technology developed for the account of the Licensor * * * [Utah I]," in exchange for which "a royalty shall be paid by Licensee * * * [U.S. Agri] to Licensor * * * [Utah I]." The amount of the royalty "shall be eighty-five percent (85%) of all products produced on the Plantation and intended to be sold or moved from the Plantation by the Licensee * * * [U.S. Agri]."

### e. The Amended Research and Development Agreement

On February 4, 1983, Kellen on behalf of Utah I, and Pace on behalf of U.S. Agri, executed an addendum to the original R&D agreement that set forth a "Research Plan" regarding the 80-acre plantation allocated to Utah I. The stated objectives of the amended research plan were:

> (1) to develop cultural information on how to manage
> Jojoba plantations in semi-arid regions of Southern

California in terms of irrigation, fertilization and weed control treatment; (2) to compare the productivity of plots established with different genetic materials; (3) determine the variations, if any, as to plant response of different genetic materials in relation to #1 above and; (4) to develop sections of Jojoba with maturation, and above average seed size.

A chart containing a configuration of the field testing to be completed on Utah I's plantation pursuant to the amended research plan was attached. Pursuant to the amended research plan, all of Utah I's land was to be planted at one time. In addition, the amended research plan contained no provision for the repetition of any of the purported experiments to average out the influence of any uncontrollable factors such as the weather.

To carry out the objectives of the amended research plan, 3 plots of 10 rows of jojoba seed each were to be divided for purposes of comparing the use of "Roundup" and "Princep" as herbicide treatments. In 1983, both "Roundup" and "Princep" were herbicides or weed killers generally available to the public for farming purposes. The amended research plan also provided for 6 subplots of 20 rows each, which would be subjected to various irrigation and fertilization techniques. The first two subplots were to be irrigated at various levels throughout the growing season, and no fertilizer would be applied to the subplots. The third and fourth subplots were to be irrigated in the same fashion but fertilized with "Uran 32". The fifth and sixth subplots also were to be irrigated in the same fashion but

fertilized with "10340". "Uran 32" and "10340" were fertilizers generally available to the farming community in 1983. The final part of the amended research plan specified that 5 acres of the 80-acre parcel allocated to Utah I was to be divided into 4 subplots. Each of the four subplots was to be planted with seed collected and cataloged by U.S. Agri as to specific geographic origin. Once the jojoba plants had emerged, they were to be irrigated at a specific rate.

The record does not establish that the above-described procedures ever were carried out. Petitioner's business records contain no formal compilation of research data or scientific analysis completed for Utah I. U.S. Agri's only records of the work allegedly carried out on behalf of Utah I are 16 pages of handwritten notes reflecting Pace's personal observations on the growth of the jojoba plants from April 1983 through December 1985. Pace's notes were made at irregular intervals and contain no scientific data. For example, in July 1983 Pace states in his notes "Emergence is very good. Continue everything exactly as it is." One year later in July 1984, Pace noted "1, 2 & 3 [a]ll look good but weeds in one are quite a problem. No observable damage or losses in 2 or 3 but probably too soon to tell." There is no evidence that Agri Futures, as the farm manager for U.S. Agri, prepared any reports regarding the status of the jojoba being grown on land allocated to Utah I.

## 2.  The Expert--Levi Chen

Levi Chen (Chen) testified for respondent as to whether any research or experimentation activities were conducted pursuant to the exclusive R&D agreement entered into between Utah I and U.S. Agri, and as to the extent and nature of any such research activities.  Chen is an engineer employed by the Internal Revenue Service in Los Angeles, California.  He visited the site of the jojoba plantation in Desert Center, California, and inspected the growing jojoba in May 1986.  Chen also visited U.S. Agri's laboratory and greenhouse in Riverside, California.  He is qualified to testify as an expert in the instant case as to the matters set forth in his report.  Petitioner did not call an expert witness to testify.

In the report he prepared with respect to the Utah I partnership, Chen concluded that the activities conducted on the 80 acres controlled by Utah I between December 31, 1982, and December 31, 1986, were irrigation, fertilization, and herbicide field tests combined with efforts to select superior jojoba plants for propagation.  The field tests were carried out using commercially available herbicides, such as "Roundup" and "Princep", and commercially available fertilizers, such as "Uran 32", and a "10-34-0"[5] mixture in different combinations, which is

---

[5]     The amended research plan refers to the fertilizer as simply "10340".

a common farming practice. Chen concluded that the activities conducted by U.S. Agri on the land allocated to Utah I did not constitute research and development and were merely farming activities. The field tests were not designed or carried out for the purpose of acquiring information about jojoba that was unknown at the time. Chen found no substantial evidence that any research was conducted.

Chen found that few, if any, scientific procedures were established for the conduct of the proposed research. In Chen's view, for the conclusion of a research project to be valid, the experiment must be able to produce repeatable results, and Utah I's research project produced no repeatable results. Chen's report elaborated:

> Experiments are planned to minimize the effects of uncontrollable factors such as weather. In botany this means that an experiment would have to be carried out on the same age plants over several years to average out the influence of the weather. Otherwise it would not be possible to determine if results were due to the experiment.

> The Partnership's Project was planted without any provision for the repetition of the experiments. The land was planted at once.

Staggered planting of the land is necessary so that the same age plants from different years could be compared and conclusions could be formed about the effectiveness of the various procedures. There is no evidence that staggered planting occurred on Utah I.

In preparing his expert report, Chen reviewed copies of the quarterly progress reports Pace, on behalf of U.S. Agri, submitted to Kellen, as general partner of Utah I, as required by the original R&D agreement.  Although Chen found that the progress reports contained some general statements about starting an "experimental procedure", by mid-1986 the progress reports contained no references to any possible research activities. Generally, however, Chen concluded that the progress reports submitted by U.S. Agri were written in the manner of general farming reports containing information on the progress of Utah I's jojoba crop.  The progress reports contained no discussion of the different experiments as set forth in the amended research plan, nor any description of how each plot was progressing relative to others or a control plot.

The handwritten notes Pace submitted were determined by Chen to be inadequate for research purposes.  They contained no record of weather conditions or growth measurements of the jojoba plants.  Furthermore, the time intervals between Pace's written observations were irregular and too far apart for Pace's notes to be of any scientific value.

Chen also determined that the plant selection portion of the amended research plan was merely an application of existing processes and techniques used to cull the best plants and was not selective breeding.  Chen's report stated that U.S. Agri's

purported plan to breed the seeds from only one generation of jojoba plants in an attempt to produce a jojoba plant with superior attributes was nothing more than U.S. Agri practicing culling. Chen's report explained that U.S. Agri's activities were not plant breeding. Producing plants with consistently superior attributes takes many generations in order to assure that "the progenies would breed true."

After touring U.S. Agri's laboratory and greenhouse in Riverside, California, Chen concluded that the activities carried out in the laboratory and greenhouse had not been contracted for by Utah I. The amended research plan of Utah I contains no references to U.S. Agri's laboratory or greenhouse. U.S. Agri did not provide Chen with any of its expense records regarding the contract fee it received from Utah I.

On the basis of the foregoing, Chen concluded that in his expert opinion "the partnership has not shown that it has done anything but farming."

## OPINION

This partnership proceeding is governed by the procedural rules of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 648, codified as secs. 6221-6233. Under section 6221, the tax treatment of partnership items is determined at the partnership level. We conclude that Utah I is not entitled to a section 174(a) research

and experimental expense deduction for 1982 because it did not directly or indirectly engage in research or experimentation.  In addition, we hold that Utah I was not actively involved in a trade or business and also lacked a realistic prospect of entering a trade or business.  Nickeson v. Commissioner, 962 F.2d 973, 978 (10th Cir. 1992), affg. Brock v. Commissioner, T.C. Memo. 1989-641; Zink v. United States, 929 F.2d 1015, 1021 (5th Cir. 1991).  Therefore, Utah I is not entitled to any additional deductions for 1982 and 1983 under section 162(a).

This Court previously has addressed the deductibility of purported research and development expenditures under section 174 by limited partnerships formed for the purported purpose of engaging in agricultural research and development of the jojoba plant.  Cactus Wren Jojoba, Ltd. v. Commissioner, T.C. Memo. 1997-504; Glassley v. Commissioner, T.C. Memo. 1996-206; Stankevich v. Commissioner, T.C. Memo. 1992-458.  In the Cactus Wren Jojoba Ltd., Glassley, and Stankevich cases, we held that the taxpayers were not entitled to deductions for research and experimental expenditures under circumstances similar to those presented in this case.

The evidence presented in this case persuades us that the R&D agreement before us was mere window dressing, designed and entered into solely to decrease the cost of participation in the jojoba farming venture for the limited partners through the

mechanism of a large up-front deduction for expenditures that in actuality were capital contributions. <u>Cactus Wren Jojoba, Ltd. v. Commissioner</u>, <u>supra</u>; <u>Glassley v. Commissioner</u>, <u>supra</u>; <u>Stankevich v. Commissioner</u>, <u>supra</u>. Additionally, Utah I was involved in neither the business of jojoba technology research nor jojoba production. At most, Utah I was a passive investor in a farming venture from which it might have received a share of any profits in the future. Kellen, the general partner of Utah I, admitted that he did not even read the private placement memorandum for Utah I, which included the R&D agreement and the license agreement, until preparing this case for trial.

A. Research and Experimental Expenditures for 1982

Section 174 allows a taxpayer[6] to elect to treat research and experimental expenditures paid or incurred during the taxable year "in connection with" the taxpayer's trade or business as expenses that are not chargeable to capital account. The expenditures so treated are allowed as a deduction. Treasury regulations provide that the expenditures may be paid or incurred for research or experimentation carried on by the taxpayer or by another on the taxpayer's behalf. Sec. 1.174-2(a), Income Tax Regs.

---

[6] The "taxpayer" for this purpose is the partnership. Cf. <u>Campbell v. United States</u>, 813 F.2d 694, 695-696 (5th Cir. 1987).

Petitioner contends that the expenditures here in issue qualify under the statutory standard. Respondent argues, first, that the expenditures in issue were not "research and experimental expenditures" and, secondly, that Utah I did not exercise sufficient direction or control over U.S. Agri to be actively involved in a trade or business in connection with jojoba production or jojoba technology research. Respondent also argues that Utah I had no realistic prospect of engaging in a trade or business related to jojoba farming and could at most act as a passive investor because of the existence of the exclusive license. Accordingly, respondent concludes that petitioner did not pay or incur "research or experimental expenditures" in connection with a "trade or business". We agree with respondent.

The term "research or experimental expenditures" as used in section 174 means "expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense." Sec. 1.174-2(a)(1), Income Tax Regs. This regulation further provides:

> The term [research or experimental expenditures] includes generally all such costs incident to the development of an experimental or pilot model, a plant process, a product, a formula, an invention, or similar property, and the improvement of already existing property of the type mentioned. The term does not include expenditures such as those for the ordinary testing or inspection of materials or products for quality control or those for efficiency surveys,

management studies, consumer surveys, advertising or promotions. * * *

Respondent claims that the amounts paid to U.S. Agri by Utah I in 1982 do not fall within the purview of the quoted regulation and are not deductible under section 174. Respondent contends that the amounts expended by Utah I were payments in connection with U.S. Agri's farming enterprise that had the commercial production of jojoba as the sole or primary objective. Furthermore, most of the amounts paid by Utah I to U.S. Agri were allocable to land development or improvement. Respondent argues that the activities of U.S. Agri were, at most, field testing and more likely were simply farming activities directed toward maximizing the potential production of the jojoba plantations. Moreover, respondent contends that no research whatsoever was performed by U.S. Agri on behalf of Utah I. Petitioner contends that U.S. Agri conducted valid research or experimentation regarding cultivation of the jojoba plant on behalf of Utah I and, consequently, under section 174(a)(1), Utah I is entitled to deduct the contract fees paid to U.S. Agri for such research or experimentation. The record in this case supports our conclusion that respondent's determinations are correct, and that petitioner's arguments to the contrary are without merit.

Attempts to farm jojoba commercially do not represent research and development in the experimental or laboratory sense. Cactus Wren Jojoba, Ltd. v. Commissioner, supra; Glassley v.

Commissioner, supra; Stankevich v. Commissioner, supra.  U.S. Agri attempted to develop a jojoba plantation that would be farmed for the oil seed.  The limited partners of Utah I would have realized income only through the sale of the jojoba oil if the plantation had been successful.  The correspondence of Pace to Kellen, introduced at trial as progress reports from U.S. Agri, did not reflect any proprietary technology but contained only a general description of the growth of the jojoba plants and was replete with optimistic comments regarding future jojoba production.  Before 1983, Pace had only limited knowledge of and minimal background in jojoba.  Despite Pace's inexperience with the jojoba plant, 16 pages of Pace's handwritten notes reflecting his personal observations on the growth of the jojoba plants from April 1983 through December 1985 were the only reports on the purported jojoba field research introduced by petitioner at trial.  U.S. Agri's laboratory and greenhouse were located in Riverside, California, and not at the site of Utah I's plantation in Desert Center, California.  Additionally, petitioner failed to provide documentation of U.S. Agri's purported research and development costs.

We agree with respondent's expert witness that U.S. Agri's actions were no more than what any farmer would do in the ordinary course of preparing to grow a crop for commercial harvesting.  The amended research plan of Utah I primarily

involved the application of commercially available herbicides, such as Roundup and Princep, and commercially available fertilizers such as Uran 32 and a 10-34-0 mixture applied with varying levels of irrigation to the jojoba plants. Application of these commercial products to a large-scale production endeavor as was attempted on the land allocated to Utah I is merely testing of the sort normally conducted as part of agricultural operations. See sec. 1.174-2(a), Income Tax Regs. Evidence presented at trial, including the testimony of both Kellen and Pace, indicates that they interpreted the activities being performed on Utah I's plantation as field testing or field trials.

The record does not show that U.S. Agri's efforts on behalf of Utah I would lead to patentable technology or even know-how. Moreover, the record does not include proof that the partially completed patent application prepared by U.S. Agri concerned work performed as part of its R&D agreement with Utah I. We note that none of the allegedly highly qualified individuals supposedly employed by U.S. Agri to conduct the purported research and experimentation on behalf of petitioner testified at trial. Additionally, we note that no one from Agri Futures testified at trial regarding the nature of the work performed by their employees on Utah I's plantation. The record shows that this case is another example of efforts by promoters and investors in

the early 1980's to reduce the cost of commencing and engaging in the farming of jojoba by claiming, inaccurately, that capital expenditures in jojoba plantations might be treated as research or experimental expenditures for purposes of claiming deductions under section 174. Cactus Wren Jojoba, Ltd. v. Commissioner, T.C. Memo. 1997-504; Glassley v. Commissioner, T.C. Memo. 1996-206; Stankevich v. Commissioner, T.C. Memo. 1992-458.

Furthermore, in this case, it is questionable whether Utah I's liability under its R&D agreement with U.S. Agri ever became fixed. According to its terms, the R&D agreement Utah I entered into with U.S. Agri on December 31, 1982, expired upon Utah I's execution of the license agreement.[7] Kellen, as general partner of Utah I, extinguished Utah I's liability under the R&D agreement by contemporaneously executing the license agreement with the R&D agreement. As an experienced attorney and bank executive, Kellen was capable of reading and understanding the details of the R&D agreement and the license agreement he executed on behalf of Utah I. Kellen showed a lack of concern

---

[7] Paragraph 11 of the R&D agreement states:

11. Terms of this Agreement

This Agreement shall be effective as of the date hereof, and shall terminate upon the first to occur of the following:

a. Upon the execution of the License Agreement referred to in Paragraph 10.a hereof;

about the details of the two agreements that he hastily signed on December 31, 1982. Utah I's liability under the R&D agreement was extinguished by Kellen's concurrent execution of the license agreement between Utah I and U.S. Agri. Therefore, the record here indicates that the amounts paid to U.S. Agri by Utah I were not even paid pursuant to a valid R&D agreement but were passive investments in a farming venture under which the investors' potential return was to be in the form of royalty pursuant to a licensing agreement.

Since Utah I did not directly or indirectly engage in research or experimentation, we hold that petitioner is not entitled to a deduction for these expenditures under section 174.

B. Requirement of a Trade or Business

In addition, we hold that the activities of Utah I did not constitute a trade or business. To be entitled to deductions for research and development expenditures, a taxpayer need not be currently producing or selling any product. Snow v. Commissioner, 416 U.S. 500, 503-504 (1974); LDL Research & Dev. II, Ltd. v. Commissioner, 124 F.3d 1338 (10th Cir. 1997), affg. T.C. Memo. 1995-172. However, "the taxpayer must still be engaged in a trade or business at some time, and we must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product

are sufficiently substantial and regular to constitute a trade or business" for purposes of section 174.  Green v. Commissioner, 83 T.C. 667, 686-687 (1984); see also Levin v. Commissioner, 87 T.C. 698, 725 (1986), affd. 832 F.2d 403 (7th Cir. 1987).

The controlling inquiry in determining whether an expenditure under section 174 was made "in connection with" the partnership's trade or business is whether the taxpayer is "'actively involved in the * * * [research project] as a trade or business.'"  LDL Research & Dev. II, Ltd. v. Commissioner, supra at 1342 (quoting Nickeson v. Commissioner, 962 F.2d at 978).  On the record of this case, Utah I has not satisfied the "active involvement" test set forth above.

To be actively involved in the research project as a trade or business, Utah I must be more than a passive investor in the activities of U.S. Agri.  Id.  To establish that expenses under section 174 were in connection with their trade or business, "taxpayers must show * * * that their activities were substantial and regular enough to establish that they were actively involved in the trade or business."  Nickeson v. Commissioner, supra at 978.  Even if this Court had found that Utah I had a fixed liability under the R&D agreement, the activities of Kellen and U.S. Agri on behalf of Utah I did not establish that Utah I was actively involved in a trade or business involving jojoba technology or jojoba production.  See, e.g., Zink v. United

States, 929 F.2d at 1021; see also Higgins v. Commissioner, 312 U.S. 212, 218 (1941).  Kellen testified that he did not even read the private placement memorandum for Utah I until preparing for the trial of this case.  Utah I's role was only to serve as a vehicle for the injection of risk capital into U.S. Agri's jojoba farming operation.  Utah I was a passive investor in a farming venture.

Utah I's actions following the execution of the R&D agreement were ministerial only.  As general partner, Kellen was not active in pursuing the affairs of Utah I.  CFS and Pace identified the investors for Utah I.  Kellen testified that CFS prepared the private placement memorandum and all related documents for Utah I.  Kellen simply signed all of the documents placed before him without any analysis or independent evaluation. Kellen did not regularly relay U.S. Agri's quarterly progress reports, in the form of correspondence from Pace, to Utah I's limited partners.  Kellen never met with the limited partners and made no effort to enforce the obligations of the limited partners who defaulted on their promissory notes.  Although Kellen claims to have "frequently" visited Utah I's plantation, the actual number of times he visited the plantation was never established. Additionally, under both the original R&D agreement and the amended research plan, as well as the licensing agreement, U.S. Agri enjoyed complete discretion and control over any research

and development as well as farming activities on the 80 acres allocated to Utah I.

We also hold that Utah I had no realistic prospect of entering into a trade or business with regard to the technology that was to be developed by U.S. Agri. The Supreme Court's decision in Snow v. Commissioner, supra, "makes it important to determine whether the prospects for developing a new product that will be exploited in a business of the taxpayer are realistic". Spellman v. Commissioner, 845 F.2d 148, 149 (7th Cir. 1988), affg. T.C. Memo. 1986-403. Unless the taxpayer can show that there is a realistic prospect that he will ultimately engage in a trade or business that exploits the developed technology, a research and experimental expenditure cannot be said to have been paid or incurred "in connection with" a trade or business. Harris v. Commissioner, 16 F.3d 75, 81 (5th Cir. 1994), affg. T.C. Memo. 1990-80, supplemented by 99 T.C. 121 (1992); Zink v. United States, supra at 1023; Spellman v. Commissioner, supra at 148-149; Diamond v. Commissioner, 92 T.C. 423, 439 (1989), affd. 930 F.2d 372 (4th Cir. 1991).

The management of investments, however, is not a trade or business, regardless of how extensive or complete the portfolio or how much time is required to manage the investments. Green v. Commissioner, supra at 688-689. This Court and other courts have scrutinized claimed research and development expenditures to

differentiate those that are legitimate from those that are merely designed to shelter the income of passive investors. See, e.g., Spellman v. Commissioner, supra; Diamond v. Commissioner, supra; Levin v. Commissioner, supra; Green v. Commissioner, supra. For an investing partnership successfully to claim research and experimental deductions, there must be a realistic prospect that the technology to be developed will be exploited in a trade or business of the partnership claiming deductions under section 174. See Diamond v. Commissioner, supra. Mere legal entitlement to enter into a trade or business does not satisfy this test. Instead, "The legal entitlement must be backed by a probability of the firm's going into business." Levin v. Commissioner, 832 F.2d at 407.

In making this determination, we consider such facts and circumstances as the intentions of the parties to the research and development contract, the amount of capitalization retained by the partnership during the research and development contract period, the exercise of control by the partnership over the person or organization conducting the research and development, the existence of an option to acquire the technology developed by the organization conducting the research and development and the likelihood of its exercise, the business activities of the partnership during the years in question, and the business experience of the partners. See Cactus Wren Jojoba, Ltd. v.

Commissioner, T.C. Memo. 1997-504; Glassley v. Commissioner, T.C. Memo. 1996-206; Mach-Tech, Ltd. Partnership v. Commissioner, T.C. Memo. 1994-225, affd. without published opinion 59 F.3d 1241 (5th Cir. 1995); Stankevich v. Commissioner, T.C. Memo. 1992-458; Stauber v. Commissioner, T.C. Memo. 1992-128.

The grant of an exclusive license to exploit technology prior to commencement of research and development may preclude a licensor from engaging in a trade or business with respect to the technology. Spellman v. Commissioner, supra; Levin v. Commissioner, 87 T.C. at 725-728; Green v. Commissioner, 83 T.C. 667 (1984).

> It is the licensee, rather than the licensor, who earns profits from the sale of the product; the licensor merely collects royalties from the licensee. Thus, by granting an exclusive license, the licensor is deprived of control over the manufacture, use, and sale of the product, and the licensee is the one engaged in the trade or business of exploiting the developed technology. [Medical Mobility Ltd. Partnership I v. Commissioner, T.C. Memo. 1993-428.]

As a mere passive investor, the licensor will not be entitled to a deduction under section 174(a) for research and experimental expenditures. Nickeson v. Commissioner, 962 F.2d at 978; Zink v. United States, 929 F.2d at 1022-1023; Diamond v. Commissioner, supra at 443.

In Green v. Commissioner, supra, a partnership entered into a research and development agreement under which it divested itself of all ownership rights in the technology to be produced under the agreement. We held that the taxpayer's partnership

could not have engaged in a trade or business as it had disposed of all of the incidents of ownership by assigning all its rights in the technology to a third party.  Id. at 689.  "Following this assignment, the partnership's activities were purely ministerial; the taxpayers were no more than mere investors."  Diamond v. Commissioner, supra at 438.

In Levin v. Commissioner, 87 T.C. at 727-728, we held that the grant of an exclusive license foreclosed the possibility that the licensor could be engaged in a trade or business in connection with the licensed product, as the licensor was deprived of control over the product.  "An entity with no control over activities in which it invests is more properly classified as an investor and cannot be engaged in a trade or business in connection with those activities."  Diamond v. Commissioner, supra at 443.

In Diamond v. Commissioner, supra, the partnership granted an option to a research contractor to acquire an exclusive license to the new technology at some future time.  Because the option could have been exercised for a relatively nominal amount, we concluded that there was no realistic prospect that the partnership would ever enter any trade or business relating to the technology.  Id. at 440-441.

In Cactus Wren Jojoba, Ltd. v. Commissioner, supra, and Stankevich v. Commissioner, supra, the limited partnership in

each case entered into an exclusive license agreement whereby the limited partnership granted the prime contractor licenses to any technology resulting from the prime contractor's research and development efforts.  As a royalty, the limited partnerships each received specified percentages of the profit interests in the jojoba crops grown on the acreage allocated to the limited partnerships for research purposes.  We held that the limited partnerships were not entitled to a deduction for research and experimental expenditures under section 174(a) because the limited partnerships were not engaged directly or indirectly in a trade or business because of the granting of the exclusive licenses.  We see no difference between the situations in <u>Cactus Wren Jojoba, Ltd. v. Commissioner</u>, <u>supra</u>, and <u>Stankevich v. Commissioner</u>, <u>supra</u>, and the facts presented in the case at bar. See also <u>Glassley v. Commissioner</u>, <u>supra</u>.

The case before us now involves the simultaneous execution by the limited partnership of an R&D agreement and an exclusive license agreement with a term of 40 years.  Additionally, the R&D agreement terminated upon execution of the license agreement.

Section 5 of the R&D agreement entered into between Utah I and U.S. Agri provides in part:

> The property rights in and to all inventions, discoveries, improvements, devices, designs, apparatus, practices, processes, methods, or products (herein individually or collectively called "Inventions"), whether patentable or not, made, developed, perfected, devised, conceived, either solely or jointly with

others, under the terms of this Agreement in the course of its Contractor's * * * [U.S. Agri's] work for the Partnership, * * * [Utah I] or any Inventions so made at any time which is an improvement on any invention covered by a patent application or patent acquired by the Partnership * * * [Utah I] shall be the sole and exclusive property of the Partnership * * * [Utah I].

Section 10 of the R&D agreement granted Utah I an option, exercisable after receipt of a written report from U.S. Agri, that the plantation was ready for commercial development:

At such time as the Jojoba plantation on which the research and development is being conducted has reached a stage of commercial development, the Contractor * * * [U.S. Agri] * * * shall give the Partnership * * * [Utah I] a written report to that effect and the Partnership * * * [Utah I] will have the option to require the Contractor * * * [U.S. Agri] to enter into a License Agreement for the purpose of commercially exploiting the technology developed pursuant to this Agreement. The License Agreement, if the Partnership * * * [Utah I] so elects, shall be in the form of the License Agreement attached hereto and made a part of this Agreement.  This option shall be solely at the discretion of the Partnership * * * [Utah I].

In section A, paragraph 3 of the license agreement attached to the R&D agreement, the "technology" is described as "written reports delivered by the Licensee * * * [U.S. Agri] to Licensor * * * [Utah I] during the term of the Research and Development Agreement, all of which, taken together in the aggregate, will comprise the technology and shall remain the sole property of the Licensor * * * [Utah I]."

Section B, paragraph 1 of the license agreement granted U.S. Agri the exclusive right to utilize the technology:

During the term hereof, Licensee * * * [U.S. Agri] shall have the exclusive right to utilize the technology developed for the account of the Licensor * * * [Utah I], and said technology shall be applied to the benefit of the parties on the Jojoba plantation * * * upon which the research and development has been conducted for the purpose of developing said technology.

Section B, paragraph 2 of the license agreement provides that "The license granted hereby shall be exclusive." Utah I relinquished all of its rights to the plantation, retaining only its nominal ownership of the technology, subject to the license, in section B, paragraph 4 of the license agreement:

Licensor * * * [Utah I] specifically disclaims any right, title, or interest in or to the Jojoba plantation on which the said technology will be developed and its sole asset is and shall be the technology for which the * * * royalty shall be paid.

Section B, paragraph 5 of the license agreement granted U.S. Agri the exclusive license for a period of 40 years.

According to the terms of the license agreement, Utah I granted U.S. Agri the exclusive right to utilize the technology developed for Utah I for 40 years in return for payments from U.S. Agri of royalties of "eighty-five percent (85%) of all products produced on the Plantation and intended to be sold or moved from the Plantation by Licensee * * * [U.S. Agri]." Section B, paragraph 6 of the licensing agreement also states "that this Agreement in no way constitutes a partnership or a joint venture between Licensor * * * [Utah I] and Licensee * * * [U.S. Agri]."

Kellen exercised Utah I's option under the R&D agreement on December 31, 1982, when he signed the license agreement. There is no evidence in the record that any useful technology ever was developed by U.S. Agri for Utah I under the terms of the R&D agreement. However, even if any technology had been developed, under the terms of the license agreement, the licensor, Utah I, relinquished any control over the technology for a 40-year period.

Utah I's election, contemporaneous with its execution of the R&D agreement, to convey the "right to utilize the technology developed" to U.S. Agri exclusively for a 40-year period reflects the passive nature of Utah I's investment. Additionally, it is evident from the words of the R&D agreement that Utah I was not going to be actively involved in the development of the jojoba plantation. As section 2 of the R&D agreement states:

> The Partnership * * * [Utah I] hereby engages Contractor * * * [U.S. Agri] to conduct the R&D Program and Contractor * * * [U.S. Agri] accepts such engagement hereunder and agrees to use its best efforts to develop a Jojoba plantation in the vicinity of Desert Center, California, at a specific location to be selected by Contractor * * * [U.S. Agri] to be used to conduct research on the domestication, commercial cultivation, planting and irrigation techniques, weed, disease and insect management and harvesting of the Jojoba plant. Said plantation to be eighty (80)acres.

It is unlikely that Kellen ever intended Utah I to enter into a trade or business. The contractual arrangements between Utah I and U.S. Agri made the prospects unrealistic that Utah I would

ever be capable of entering into a trade or business with respect to any technology that might be developed. Under the terms of the license agreement, Utah I was deprived of control over any technology U.S. Agri might have developed.[8] Kellen's actions were consistent with investor activity and not the activity of a person engaged in a trade or business.

"A taxpayer that funds research by another party in return for royalties is clearly no more than an investor making a capital contribution to the trade or business of another." LDL Research & Dev. II, Ltd. v. Commissioner, 124 F.3d at 1346. It is clear that Utah I funded alleged "research activities" of U.S. Agri with the expectation of royalties from the sale of the jojoba beans. The promotional videotape prepared by Pace, and distributed to potential investors in jojoba limited partnerships serviced by U.S. Agri, heavily emphasized the potential for a high rate of return from an investment in "liquid gold" or jojoba.

As the contractor for Utah I, U.S. Agri was the only entity engaged in a trade or business related to jojoba farming. Pace

---

[8] As the Court of Appeals for the Fifth Circuit noted in Harris v. Commissioner, 16 F.3d 75,79 (5th Cir. 1994), affg. T.C. Memo. 1990-80, supplemented by 99 T.C. 121 (1992): "those cases in which a section 174 deduction was upheld may be distinguished by one dispositive factor: In each of the cases allowing the deduction, the entity that incurred the research expenses actually managed and actually controlled the use or marketing of the research".

testified at trial that U.S. Agri was operating commercial jojoba farms on 906 acres of land in Desert Center and Blythe, California, in addition to the 400 acres U.S. Agri had allegedly set aside for R&D partnerships focused on jojoba. Respondent's expert witness, Chen, visited U.S. Agri's greenhouse and laboratory in Riverside, California. The actions of Kellen, including irregular visits to the plantation site and forwarding three of U.S. Agri's progress reports on the status of the maturing jojoba plants to the limited partners of Utah I, were merely the actions of an interested investor keeping up with his investment. There is no evidence that Kellen ever inspected U.S. Agri's laboratory or greenhouse.

There is no evidence before this Court regarding the details of U.S. Agri's operating budget other than testimony from Pace that none of U.S. Agri's losses were allocated to Utah I.

Utah I had no employees. See Harris v. Commissioner, 16 F.3d at 80 n.10. Petitioner presented no evidence that Utah I exercised any control over the activity on the jojoba plantation. The evidence before us establishes that Utah I's role was to distribute the money invested by the limited partners to U.S. Agri pursuant to agreement. U.S. Agri then used these funds to finance activities on the 80-acre plantation site, including planting the jojoba, tilling and leveling the land, and installing the irrigation system. These funds were also used by

U.S. Agri to make lease payments to the Sterling Trust. Additionally, funds from investor subscriptions in Utah I went to reimburse Pace or U.S. Agri for any developmental expenses incurred on the plantation prior to the incorporation of Utah I.

Utah I was not adequately capitalized for operation as a business in the long term, as evidenced by Kellen's decision in 1991 to consolidate Utah I with 36 other jojoba limited partnerships under contract with U.S. Agri into 1 large limited partnership, Jojoba Plantation Ltd.  Kellen and the other general partners hoped that the creation of one large limited partnership would enable them to reduce the costs of farming jojoba.  By 1991, Jojoba Plantation was in chapter 7 bankruptcy.  Kellen made no attempt to pursue any of the limited partners who defaulted on their promissory notes to Utah I.

On the record in the instant case, we agree with respondent that Utah I did not pay the contract fees for research or experimentation to be conducted by U.S. Agri on behalf of the limited partnership.  Rather, for the reasons discussed above, we conclude that the moneys the limited partnership remitted to Utah I for the putative research or experimentation, in actuality, were paid for the limited partners' right to participate as passive investors in the jojoba farming enterprise being operated by U.S. Agri in Desert Center, California.  In our view, the R&D agreement was designed and entered into solely to provide a

mechanism to disguise the capital contributions of the limited partners as currently deductible expenditures and thus reduce the cost of their participation in the farming venture.

Accordingly, we hold that Utah I is not entitled to deduct its losses for research or experimentation expenditures under section 174.  Additionally, because the activities of Utah I did not constitute a trade or business, Utah I is not entitled to deduct its losses in 1982 and 1983 as ordinary and necessary business expenses under section 162(a).  Respondent is sustained on these issues.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.