T.C. Memo. 2002-19


UNITED STATES TAX COURT


WILLIAM G. AND DEBRA C. KELLEN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5429-00.                    Filed January 22, 2002.


<u>Robert S. Schriebman</u> and <u>Patrick E. McGinnis</u>, for
petitioners.

<u>Timothy S. Sinnott</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


ARMEN, <u>Special Trial Judge</u>:  In a so-called affected items
notice of deficiency, respondent determined additions to tax to
petitioners' Federal income tax for the year and in the amounts
as shown below:

| | Additions to tax | | |
|---|---|---|---|
| Year | Sec.[1] 6653(a)(1) | Sec. 6653(a)(2) | Sec. [3]6661 |
| 1983 | $685.50 | [2]$29,095.94 | $3,427.50 |

[1] Throughout this opinion and unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue.

[2] The first page of the notice of deficiency mistakenly shows this amount as the sum of the additions to tax under sec. 6653(a)(1) and (2), i.e., $29,781.

[3] The first page of the notice of deficiency mistakenly references sec. 6662(d), which section is the successor to sec. 6661 and is applicable for returns the due date for which (determined without regard to extensions) is after December 31, 1989. See Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7721(a), (c)(2), (d), 103 Stat. 2395-2400.

After concessions by the parties,[1] the issues for decision are as follows:

(1) Whether petitioner William G. Kellen (petitioner) is liable for additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of rules or regulations. We hold that petitioner is liable for such additions.

(2) Whether petitioner is liable for the addition to tax under section 6661 for substantial understatement of tax

---

[1] Petitioners concede that the notice of deficiency is valid. Cf. Scar v. Commissioner, 814 F.2d 1363 (9th Cir. 1987), revg. 81 T.C. 855 (1983).
Respondent concedes, and petitioner William G. Kellen does not dispute, that pursuant to sec. 6015, petitioner Debra C. Kellen is entitled to relief from joint and several liability for the additions to tax.

liability. We hold that petitioner is liable for such addition.

The foregoing two issues relate to the participation of petitioner as a limited partner in a jojoba partnership known as San Nicholas Research, Ltd.

FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found. The stipulated facts and attached exhibits are incorporated herein by this reference.

Petitioner resided in Cora, Wyoming, at the time that his petition was filed with the Court.

A. Petitioner's Education and Experience

Petitioner is a highly educated individual. In 1964, he graduated from Loyola University of Los Angeles with a bachelor of science degree in civil engineering, specializing in water systems. Ten years later, in 1974, he received a law degree from Western State College of Law in Fullerton, California.

Since 1964, petitioner has practiced engineering in both the public and private sectors. Since 1974, he has practiced law in the private sector.

Petitioner also has experience related to farming. In 1974, he formed a company known as the Great American Hay Company that grew hay in Desert Center, California. In 1975, he and certain friends and investors purchased property known as Brown's Farm that grew citrus, alfalfa, and row crops.

In 1983, the taxable year in issue, petitioner was actively engaged in the practice of law, although he also served as a consulting engineer and was involved in farming.[2]  Petitioner maintained a law office in Riverside, California, and he specialized in the formation of financial institutions, such as banks, savings and loan associations, and thrift and loan associations.  Petitioner formed more than 23 financial institutions in southern California.

Neither in 1983 nor at any other time relevant to this case did petitioner have any expertise in accounting or tax matters, nor did he ever attempt to render advice on those subjects.

In 1983, petitioner was financially well-off and sophisticated.  For that year, he earned a net profit of $122,464 from his law practice, and he derived capital gains from stock transactions in the net amount of $115,508[3] and interest in the amount of $21,747.  In addition, petitioner had equity interests in: (1) An equipment rental proprietorship, (2) a partnership known as Fontana Bancorp Development, (3) five jojoba partnerships, see pp. 5-6, and (4) an S corporation known as

_____

[2] Any income that petitioner may have earned in 1983 from consulting as an engineer or from farming was minimal.

[3]  In one instance, petitioner parlayed a $5,000 investment in Corona Bancorp in June 1982 into a $98,508 sale in Dec. 1983.

Vancouver Coors, Inc.[4]

B.  Petitioner's Initial Involvement in Jojoba Partnerships

In late 1982, petitioner became the general partner and tax matters partner of four limited partnerships: Utah Jojoba Research, Ltd. (Utah Jojoba); Blythe Jojoba I Research, Ltd. (Blythe Jojoba I); Blythe Jojoba II Research, Ltd. (Blythe Jojoba II); and Desert Center Jojoba Research, Ltd. (Desert Center Jojoba).[5]  Each of these partnerships was similar, if not identical, to San Nicholas Research, Ltd., described infra pp. 5-11.

Prior to 1982, petitioner did not have any experience in growing jojoba, nor did he have any experience in either the research or development of jojoba.  Prior to that time, petitioner's knowledge concerning jojoba was limited to articles that he had read in various magazines and a general familiarity with the existence of an experimental jojoba plantation located at the University of California at Riverside.

---

[4] At trial, petitioner testified that he became a general partner in Coordinated Financial Services (CFS) of Salt Lake City, Utah "in the latter part of 1982."  The record is not clear whether petitioner continued to be a partner in CFS in 1983.  CFS is described in Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6; see infra pp. 12-14.

[5]  Petitioner also became a limited partner in Desert Center Jojoba.

C.  Petitioner's Investment in San Nicholas Research, Ltd.

In late 1983, petitioner signed a subscription agreement and purchased 15 limited partnership units (an 11.719-percentage interest) in San Nicholas Research, Ltd. (San Nicholas or the partnership).[6]  Petitioner purchased the partnership units pursuant to a private placement memorandum dated October 10, 1983.  See infra pp. 6-8, 8-11.

Petitioner paid $2,790 per limited partnership unit, or a total of $41,850, for his 15 units in San Nicholas.  Of this amount, $1,140 per unit, or $17,100 for 15 units, was paid in cash.  The balance, $1,650 per unit or $24,750 for 15 units, was payable pursuant to a 10-year promissory note.[7]

At the time that he signed the subscription agreement, petitioner believed that his investment in San Nicholas offered tax benefits, and his decision to invest was influenced by that belief.

D.  Putative Nature of San Nicholas' Business

According to the private placement memorandum dated October 10, 1983 (the offering memorandum), San Nicholas was formed in

---

[6] The general partner and tax matters partner of San Nicholas was Alfred M. Clancy, an individual whom petitioner did not know at the time that he invested in San Nicholas.

[7] The note, which was recourse in form, contemplated payments of interest only for the first 5 years.  As matters actually transpired, in the late 1980s, the limited partners were given the option of paying a discounted percentage of the principal in cash.  Petitioner elected this option.

order "to undertake a comprehensive research and development program on the plant Simmondsia Chinesis (Jojoba)."  The offering memorandum described how this program was to be carried out:

> The Partnership will enter into a research and development contract * * * with U.S. Agri Research and Development Corp. (the "R & D Contractor"), who will conduct the experiments in various test sites * * * as well as its laboratory or greenhouse facilities that it in its sole discretion deems advisable.  In addition, the R & D Contract sets forth that a site in the vicinity of Desert Center and Blythe, California of from 30-50 acres will be delineated as the applied research site upon which all technology and improved cultivars developed on behalf of the Partnership during the term of the contract will be placed "in field." The Partnership will also have the right but not be obligated to enter into a License Agreement * * * to license to U.S. Agri Research and Development Corp. all technology developed on behalf of the Partnership for a period of forty (40) years and receive therefrom an amount equal to 85% of the products produced from the developed technology.[8]

Copies of the research and development (R&D) contract and the license agreement referred to in the preceding paragraph were attached as exhibits to the offering memorandum.  The R&D contract identified U.S. Agri Research and Development Corp. (U.S. Agri) as a party to the contract and the R&D contractor thereunder.  The license agreement identified U.S. Agri as a

---

[8]  Although San Nicholas may not have been obligated to enter into a license agreement with U.S. Agri Research and Development Corp., it was a foregone conclusion that it would do so.  Indeed, the research and development (R&D) contract and the license agreement were executed concurrently.  Notably, execution of the license agreement by San Nicholas served to automatically terminate the R&D contract pursuant to the terms of the latter contract.  See <u>infra</u> pp. 19-20.

party to the contract and the licensee thereunder.

## E.  U.S. Agri and Eugene Pace

As previously indicated, the offering memorandum identified U.S. Agri as the R&D contractor under the R&D contract and as the licensee under the license agreement.  U.S. Agri was also the R&D contractor and the licensee for Utah Jojoba, Blythe Jojoba I, Blythe Jojoba II, and Desert Center Jojoba.

The president of U.S. Agri was Eugene Pace (Mr. Pace), who was also a member of its board of directors.  Petitioner also served as a member of U.S. Agri's board until he became general partner of Utah Jojoba, Blythe Jojoba I, Blythe Jojoba II, and Desert Center Jojoba in late 1982.

At the time that petitioner invested in San Nicholas, he and Mr. Pace had been personal friends and business associates for a number of years.

## F.  Cautionary Language in the San Nicholas Offering Memorandum

The face of the offering memorandum warned, in block letters, that "THIS OFFERING INVOLVES A HIGH DEGREE OF RISK". The offering memorandum also included the following cautionary language in block letters:

> PROSPECTIVE INVESTORS ARE CAUTIONED NOT TO CONSTRUE
> THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT
> COMMUNICATIONS AS CONSTITUTING LEGAL OR TAX ADVICE.
> * * * INVESTORS ARE URGED TO CONSULT THEIR OWN COUNSEL
> AS TO ALL MATTERS CONCERNING THIS INVESTMENT.

*        *        *        *        *        *        *

THERE IS NO PUBLIC OR OTHER MARKET FOR THE UNITS, NOR
WILL SUCH MARKET DEVELOP.

      *     *     *     *     *     *     *

THE PURCHASE OF SUCH UNITS DESCRIBED IN THIS MEMORANDUM
INVOLVES A HIGH DEGREE OF RISK (SEE "RISK FACTORS") AND
SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN AFFORD THE
TOTAL LOSS OF THEIR INVESTMENT.

      *     *     *     *     *     *     *

EACH PURCHASER OF THE UNITS HEREIN SHOULD AND IS
EXPECTED TO CONSULT WITH HIS OWN TAX ADVISOR AS TO THE
TAX ASPECTS.

In addition, the offering memorandum limited the sale of
partnership units to investors with a net worth (exclusive of
home, furnishings, and automobiles) of at least $150,000, or
investors whose net worth was at least $50,000 (exclusive of
home, furnishings, and automobiles) and who anticipated that, for
the taxable year of the investment, they would have gross income
of at least $65,000 or taxable income, a portion of which, but
for tax-advantaged investments, would be subject to Federal
income tax at a marginal rate of 50 percent.

The offering memorandum included a section entitled "Risk
Factors", which was the single longest section.  It began with a
general warning:

> The purchase of the interests offered hereby involves
> various risk factors.  Investment in the Partnership
> * * * involves an extremely high degree of risk.
> Investors should consider carefully the various risk
> factors set forth in this and other portions of this
> Memorandum.  Investment in the Partnership is suitable
> only for persons of substantial financial means who

> will not require liquidity in the investment. Investors must be prepared for the possible loss of their entire investment.

The offering memorandum then proceeded to discuss a number of specific, and significant, risk factors associated with an investment in San Nicholas. Among those risks, the offering memorandum warned: (1) Research and development risks were so great that an investment in San Nicholas should be considered "highly speculative"; (2) the general partner had no previous experience in dealing in jojoba; (3) there was no structured market or distribution system for jojoba; (4) there were no facilities dedicated to the processing of jojoba; (5) commercial applications of jojoba are not extensive; (6) the general partner had not conducted any market analysis or similar studies; (7) there was no assurance of any increase in marketing or production facilities or in the demand for jojoba; (8) in the absence of any such increase, the production of jojoba might be unprofitable, regardless of any technology that might be developed by the R&D contractor; and (9) there was the likelihood of audit by the Internal Revenue Service. Indeed, the discussion concerning the tax risks associated with an investment in San Nicholas constituted half of the section on "Risk Factors".

The offering memorandum also included projections of revenue, cashflow, and taxable income or loss. Investors were warned, however, that those projections, which had been prepared

for the general partner, had not been audited and that they should not be relied on to indicate the actual results that might be attained.

## G.  Petitioner's Friend and Associate E.T. Jacobs

E.T. Jacobs (Mr. Jacobs), a former IRS agent and examination manager, was a certified public accountant in private practice. He was also one of petitioner's friends and business associates.

In or about 1982, Mr. Jacobs became involved in the farming of jojoba in Desert Center, California.  Mr. Jacobs sold limited partnership interests in a number of jojoba partnerships.

## H. Petitioner's 1983 Schedule K-1 and Income Tax Return

Petitioner received a Schedule K-1, Partner's Share of Income, Credits, Deductions, Etc., from San Nicholas for 1983. The Schedule K-1 reported that petitioner's distributive share of partnership loss from San Nicholas was $37,064 for that year.

Petitioner timely filed a Federal income tax return (Form 1040) for 1983.[9]  Petitioner attached to his return page 2 of Schedule E (Supplemental Income Schedule) and claimed thereon a loss from San Nicholas in the amount of $37,064.  Petitioner then offset this loss against his other income.  See supra p. 4.

## I.  Jojoba Partnership Litigation

San Nicholas was examined by the Internal Revenue Service,

---

[9] The return was prepared by David Macher, a certified public accountant in Riverside, California.

and a notice of final partnership administrative adjustment (FPAA) was ultimately issued to the partnership.  In December 1991, Alfred M. Clancy (Mr. Clancy), the general partner and tax matters partner of San Nicholas, commenced a TEFRA partnership proceeding in this Court.[10]  Subsequently, in November 1993, Mr. Clancy and the Commissioner agreed to be bound by the decision to be entered in Utah Jojoba I Research v. Commissioner, docket No. 7619-90, a TEFRA partnership proceeding involving Utah Jojoba that had previously been commenced by petitioner in his capacity as tax matters partner of that partnership.

In Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6, the Court made detailed findings of fact related to the jojoba limited partnerships,[11] petitioner, U.S. Agri, and Mr. Pace.  The Court described the R&D contract between the partnerships and U.S. Agri as "mere window dressing" and held that the partnerships did not, directly or indirectly, engage in research or experimentation and that the partnerships lacked a realistic prospect of entering into a trade or business.  In upholding the

_____

[10] The TEFRA partnership proceeding was assigned docket No. 29994-91.  TEFRA stands for the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 648.  See secs. 6221-6232; N.C.F. Energy Partners v. Commissioner, 89 T.C. 741, 744 (1987); Maxwell v. Commissioner, 87 T.C. 783, 789 (1986).

[11] At least 18 docketed cases were bound by stipulation to the outcome of Utah Jojoba I Research v. Commissioner, docket No. 7619-90.

Commissioner's disallowance of research and experimental expenditures, the Court concluded that the agreements between the partnerships and the R&D contractor (U.S. Agri) had been designed and entered into solely to provide a mechanism to disguise the capital contributions of limited partners as currently deductible expenditures.[12]  The Court stated that the activities of the partnerships were "another example of efforts by promoters and investors in the early 1980s to reduce the cost of commencing and engaging in the farming of jojoba by claiming, inaccurately, that capital expenditures in jojoba plantations might be treated as research or experimental expenditures for purposes of claiming deductions under section 174."  Id.

In November 1998, Mr. Clancy, acting in his capacity as tax matters partner of San Nicholas, consented to entry of decision against the partnership.  Subsequently, in December 1998, the Court entered decision against San Nicholas pursuant to the Commissioner's Motion for Entry of Decision under Rule 248(a).[13]  Thereafter, the Commissioner assessed a deficiency in petitioner's income tax for 1983 in the amount of $13,710 and mailed a so-called affected items notice of deficiency to

_____

[12] In other words, in order to decrease the limited partners' cost of investing in the jojoba partnerships, large up-front deductions were manufactured from expenditures that were actually capital contributions.

[13] All Rule references are to the Tax Court Rules of Practice and Procedure.

petitioner determining additions to tax for negligence and substantial understatement of tax liability.  See sec. 6230(a); N.C.F. Energy Partners v. Commissioner, 89 T.C. 741, 744 (1987); Maxwell v. Commissioner, 87 T.C. 783, 792 n.9 (1986).  It is those additions to tax that are in issue in the present case.

J. Epilogue: Demise of the Jojoba Partnerships

The jojoba partnerships proved to be financial failures.  In October 1991, some 30 to 40 jojoba partnerships under contract with U.S. Agri were consolidated into one large limited partnership, Jojoba Plantation Ltd.  Sometime thereafter, Jojoba Plantation Ltd. filed a petition in bankruptcy under chapter 7 of the Bankruptcy Act.  See Utah Jojoba I Research v. Commissioner, supra.

At trial, petitioner testified that the jojoba partnerships failed because of the Internal Revenue Service.[14]  At a previous trial, petitioner testified that "the collapse, basically, of the tax incentive for doing jojoba" contributed to the partnerships' failure.  See id.

---

[14] Petitioner's sole third-party witness suggested a different reason:  That no commercially viable method of harvesting jojoba was ever developed.

OPINION

We have decided many jojoba cases involving additions to tax for negligence and substantial understatement of tax liability.[15] We have found the taxpayers liable for additions to tax for negligence in all of those cases; likewise, we have found the taxpayers liable for the addition to tax for substantial understatement of tax liability in all of those cases that have presented that issue.

## I.   Section 6653(a)(1) and (2) Negligence

The first issue for decision is whether petitioner is liable for additions to tax under section 6653(a)(1) and (2) with respect to the underpayment of tax attributable to petitioner's investment in San Nicholas.  Petitioner has the burden of proof to show that he is not liable for these additions to tax.  See Addington v. Commissioner, 205 F.3d 54, 58 (2d Cir. 2000), affg. Sann v. Commissioner, T.C. Memo. 1997-259; Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972); Anderson v. Commissioner, T.C. Memo.

---

[15] See, e.g., Lopez v. Commissioner, T.C. Memo. 2001-278; Christensen v. Commissioner, T.C. Memo. 2001-185; Serfustini v. Commissioner, T.C. Memo. 2001-183; Carmena v. Commissioner, T.C. Memo. 2001-177; Nilsen v. Commissioner, T.C. Memo. 2001-163; Ruggiero v. Commissioner, T.C. Memo. 2001-162; Robnett v. Commissioner, T.C. Memo. 2001-17; Harvey v. Commissioner, T.C. Memo. 2001-16; Hunt v. Commissioner, T.C. Memo. 2001-15; Fawson v. Commissioner, T.C. Memo. 2000-195; Downs v. Commissioner, T.C. Memo. 2000-155; Glassley v. Commissioner, T.C. Memo. 1996-206; Stankevich v. Commissioner, T.C. Memo. 1992-458.

1993-607, affd. 62 F.3d 1266 (10th Cir. 1995).  See generally Rule

142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992);

Welch v. Helvering, 290 U.S. 111, 115 (1933).[16]

Section 6653(a)(1) imposes an addition to tax in an amount

equal to 5 percent of the underpayment of tax if any part of the

underpayment is due to negligence or intentional disregard of

rules or regulations.  Section 6653(a)(2) imposes another

addition to tax in an amount equal to 50 percent of the interest

due on the portion of the underpayment attributable to negligence

or intentional disregard of rules or regulations.

Negligence is defined as the failure to exercise the due

care that a reasonable and ordinarily prudent person would

exercise under like circumstances.  See Anderson v. Commissioner,

62 F.3d 1266, 1271 (10th Cir. 1995), affg. T.C. Memo. 1993-607;

Neely v. Commissioner, 85 T.C. 934, 947 (1985).  The focus of

inquiry is the reasonableness of the taxpayer's actions in light

of the taxpayer's experience and the nature of the investment.

See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740

(1973); see also Sacks v. Commissioner, 82 F.3d 918, 920 (9th Cir.

1996) (whether a taxpayer is negligent in claiming a tax

deduction "depends upon both the legitimacy of the underlying

---

[16] Cf. sec. 7491(c), effective for court proceedings arising in connection with examinations commencing after July 22, 1998.  In the present case, the examination of petitioner's income tax return for 1983 commenced well before July 22, 1998.

investment, and the due care in the claiming of the deduction."), affg. T.C. Memo. 1994-217; Turner v. Commissioner, T.C. Memo. 1995-363. In this regard, the determination of negligence is highly factual.

Under some circumstances, a taxpayer may avoid liability for negligence if reasonable reliance on a competent professional adviser is shown. See United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on another issue 501 U.S. 868 (1991). However, reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. See Freytag v. Commissioner, supra. For reliance on professional advice to excuse a taxpayer from negligence, the taxpayer must show that the professional had the requisite expertise, as well as knowledge of the pertinent facts, to provide informed advice on the subject matter. See David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, 39 F.3d 402, 407 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra.

The facts pertinent to the present case relating to the structure, formation, and operation of San Nicholas are as found above and as discussed in Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6. The offering memorandum identified U.S. Agri

as the contractor under the R&D contract.  In addition, a license agreement between San Nicholas and U.S. Agri granted U.S. Agri the exclusive right to use all technology developed for the partnership for 40 years in exchange for a royalty of 85 percent of the products produced from such technology.  The R&D contract and the license agreement were executed concurrently.

According to its terms, the R&D contract expired upon the partnership's execution of the license agreement.  Because the two contracts were executed concurrently, amounts paid by the partnership to U.S. Agri were not paid pursuant to a valid R&D contract but rather were passive investments in a farming venture under which the investors' return, if any, was to be in the form of royalties pursuant to the license agreement.  Thus, as the Court held in Utah Jojoba I Research v. Commissioner, supra, the partnership was never engaged in research or experimentation, either directly or indirectly.  Moreover, the Court found that U.S. Agri's attempt to farm jojoba commercially did not constitute R&D, thereby concluding that the R&D contract was designed and entered into solely to decrease the limited partners' cost of investing in an jojoba partnership through large, upfront deductions for expenditures that were actually capital contributions.  The Court further concluded that the partnership was not involved in a trade or business and had no realistic prospect of entering into a trade or business with

respect to any technology that was to be developed by U.S. Agri. Id.

Notwithstanding the foregoing, petitioner contends that his investment in San Nicholas was motivated solely by the potential to earn a profit. Petitioner also contends that, taking into account his experiences as a farmer and engineer and the nature of his investment, he exercised the due care that a reasonable and ordinarily prudent person would have exercised under like circumstances. Finally, petitioner contends that reliance on Mr. Pace, Mr. Jacobs, and a professor at the University of California should absolve him of liability for negligence in this case. For the following reasons, we disagree with petitioner's contentions.

First, the principal flaw in the structure of San Nicholas was evident from an examination of the R&D contract and the license agreement. Both of these documents were a part of the offering memorandum. A reading of the R&D contract and the license agreement demonstrates that the license agreement canceled, or rendered ineffective, the R&D contract because of the concurrent execution of the two documents. Accordingly, San Nicholas was never engaged in, either directly or indirectly, any research or experimentation. Rather, San Nicholas was merely a passive investor seeking royalty returns pursuant to the license agreement. See Lopez v. Commissioner, T.C. Memo. 2001-278; Christensen v. Commissioner, T.C. Memo. 2001-185; Serfustini v.

<u>Commissioner</u>, T.C. Memo. 2001-183; <u>Carmena v. Commissioner</u>, T.C. Memo. 2001-177; <u>Nilsen v. Commissioner</u>, T.C. Memo. 2001-163; <u>Fawson v. Commissioner</u>, T.C. Memo. 2000-195. Petitioner, an experienced attorney, should have understood the legal ramifications of the license agreement canceling the R&D contract.

Second, we are unable to accept uncritically petitioner's contention that he invested in San Nicholas solely to earn a profit.[17] Rather, at the time that he signed the subscription agreement, petitioner believed that his investment in San Nicholas offered tax benefits, and his decision to invest was influenced by that belief.

Third, we do not think that petitioner, a well-educated and successful attorney and a sophisticated investor, exercised due care at the time that he signed the subscription agreement. In this regard we are again unable to accept uncritically petitioner's contention that he reasonably relied on the offering memorandum. The short answer to this contention is that

---

[17] It is the duty of the Court to listen to testimony, observe the demeanor of witnesses, weigh the evidence, and determine what to believe. The Court is not required to accept testimony at face value, and the Court may discount a party's self-interested testimony and place reliance on other evidence that is believed to be more reliable. See <u>Christensen v. Commissioner</u>, 786 F.2d 1382, 1383-1384 (9th Cir. 1986), affg. in part and remanding in part T.C. Memo. 1984-197; <u>Niedringhaus v. Commissioner</u>, 99 T.C. 202, 212 (1992); <u>Duralia v. Commissioner</u>, T.C. Memo. 1994-269; see also <u>Tokarski v. Commissioner</u>, 87 T.C. 74, 77 (1986).

petitioner either did not read the offering memorandum in its entirety or chose to ignore portions thereof.  See Goldman v. Commissioner, 39 F.3d 402, 407-408 (2$^d$ Cir. 1994), affg. T.C. Memo. 1993-480, holding that the taxpayer's reliance on offering materials was not reasonable; see also Pasternak v. Commissioner, 990 F.2d 893, 903 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181, holding that claims that are probably "too good to be true" should be investigated by a reasonably prudent person.[18]

The offering memorandum was replete with caveats and warnings regarding the business and tax risks associated with an investment in San Nicholas.  The cover page cautioned that "THIS OFFERING INVOLVES A HIGH DEGREE OF RISK" and warned prospective investors "NOT TO CONSTRUE THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS AS CONSTITUTING LEGAL OR TAX ADVICE."  Potential inventors were urged "TO CONSULT THEIR OWN COUNSEL AS TO ALL MATTERS CONCERNING THIS INVESTMENT" and were advised "TO CONSULT WITH [THEIR] OWN TAX ADVISOR AS TO THE TAX ASPECTS."  The single longest section of the offering memorandum was devoted to "risk factors" and warned of numerous risks, specifically including tax risks, the lack of a structured market and

---

[18] In the present case, the parties stipulated to a promotional videotape produced by U.S. Agri that described jojoba as "liquid gold" and "the industrial crop of the future", which would be cultivated in "some of the most hostile land anywhere".

distribution system for jojoba, and the highly speculative nature of the investment. Petitioner ignored these warnings.

On brief, petitioner painstakingly dissects portions of the offering memorandum in an attempt to show that he carefully perused what he calls a "business plan". Petitioner's piecemeal approach to the offering memorandum ignores the existence of the strong cautionary language. A careful review of the offering memorandum, especially the portion discussing the tax risks, would have caused a prudent investor to question the propriety of the tax benefits. We would certainly expect no less from a well-educated and sophisticated individual such as petitioner.

Petitioner contends that he also conducted his own analysis of San Nicholas prior to investing. However, there is no persuasive evidence that petitioner's "analysis" was based on anything other than the projections set forth in the offering memorandum. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Investors were warned, however, that those projections had been prepared for the general partner, had not been audited, and should not be relied on. There is nothing in the record to persuade us that petitioner's "projections" were ever audited or examined by any disinterested third party. Any reliance on those projections was unreasonable.

Petitioner contends that his experience with farming and his reading about jojoba gave him confidence in the viability of his

investment in San Nicholas. Yet, petitioner's experience and his knowledge should have led him to inquire into both the operational aspects of the partnership and the nature of the research that U.S. Agri was to conduct under the terms of the R&D contract.[19] See Fawson v. Commissioner, T.C. Memo. 2000-195.

Although petitioner claims to have visited the jojoba sites about once a month, the primary purpose of these visits was to "see how the plants were growing" and that proper watering and weeding methods were being utilized. However, there is no persuasive evidence in the record to demonstrate that petitioner, either as a limited partner in San Nicholas or as the general partner and tax matters partner of four other jojoba partnerships, visited the jojoba sites in order to determine whether research or development was being conducted. If petitioner had visited the jojoba sites for that purpose, he would have quickly discovered that U.S. Agri was engaged in

---

[19] We find it curious that petitioner would choose to emphasize his experience when the record clearly demonstrates that prior to 1982, he did not have any experience in growing jojoba, nor did he have any experience in either the research or development of jojoba. Petitioner's experience first came in late 1982, when he became the general partner and tax matters partner of Utah Jojoba, Blythe Jojoba I, Blythe Jojoba II, and Desert Center Jojoba.

We find it equally curious that petitioner would choose to emphasize his knowledge when the record demonstrates that prior to 1982, his knowledge was limited to articles that he had read in various magazines and a general familiarity with the existence of an experimental jojoba plantation located at the University of California at Riverside.

nothing more than a farming activity.  See <u>Fawson v. Commissioner</u>, <u>supra</u>.  Petitioner should have realized that in the absence of any research and development, there could be no deduction for research and experimental expenditures under section 174.

Fourth, petitioner contends that in deciding to invest in San Nicholas, he reasonably relied on advice from Mr. Pace, Mr. Jacobs, and a professor at the University of California.  For reasons that we shall discuss, we disagree that any such reliance was reasonable.

Petitioner contends that he reasonably relied on advice from Mr. Pace.  At the time of trial, Mr. Pace was deceased; accordingly, we do not know first hand what knowledge he may have had or what advice he may have given.[20]  The record does establish that Mr. Pace was the president of U.S. Agri and a member of its board of directors.  Petitioner, who for a period of time was also a member of U.S. Agri's board, obviously knew that Mr. Pace was an interested party and that Mr. Pace had a conflict of interest.  Thus, whatever advice petitioner may have received from Mr. Pace fails as a defense to negligence because of Mr. Pace's lack of competence to give such advice and the clear presence of a conflict of interest.  See <u>Rybak v. Commissioner</u>,

---

[20] In <u>Utah Jojoba I Research v. Commissioner</u>, T.C. Memo. 1998-6, the Court found that before 1983, Mr. Pace had only limited knowledge of, and minimal background in, jojoba.

91 T.C. 524, 565 (1988).

Petitioner also contends that he reasonably relied on advice from Mr. Jacobs. At the time of trial, Mr. Jacobs was deceased; accordingly, we do not know first hand what knowledge he may have had or what advice he may have given. The record does establish that Mr. Jacobs only became involved in the farming of jojoba in or about 1982, so his experience was limited, and there is nothing to suggest that he was knowledgeable about research and development of jojoba. See Freytag v. Commissioner, 89 T.C. at 888. The record also establishes that Mr. Jacobs was involved in the sale of limited partnership interests in a number of jojoba partnerships. Accordingly, any advice that he may have given can be analogized to that of a promoter, which advice is inherently suspect. E.g., Addington v. Commissioner, 205 F.3d at 59; Pasternak v. Commissioner, 990 F.2d at 903.

In Glassley v. Commissioner, T.C. Memo. 1996-206, we found that the taxpayers:

> acted on their fascination with the idea of participating in a jojoba farming venture and their satisfaction with tax benefits of expensing their investments, which were clear to them from the promoter's presentation. They passed the offering circular by their accountants for a "glance" * * *.

The record in the present case suggests that whatever advice may have been given by Mr. Jacobs was nothing more than a generalized affirmation to invest in jojoba. Indeed, at trial, petitioner testified that Mr. Jacobs was "very high on the investments in

jojoba, and I--and that was the primary reason I invested in it."

Petitioner also contends that he reasonably relied on advice from a professor at the University of California at Riverside, a Dr. Yermanos. This individual did not testify at trial, so we do not know first hand what advice he may have given or on what basis such advice may have been rendered.[21] However, the record suggests that petitioner never compensated Dr. Yermanos for his time and that Dr. Yermanos may have merely opined on whether the jojoba industry as a whole could become profitable.[22] There is nothing in the record to suggest that petitioner ever discussed the details of San Nicholas with Dr. Yermanos or that Dr. Yermanos even knew about the existence of that partnership. In short, petitioner's testimony concerning Dr. Yermanos is too amorphous for us to conclude that whatever advice Dr. Yermanos may have provided was sufficiently informed to absolve petitioner from liability for the additions to tax for negligence.

Finally, petitioner relies heavily on Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994). That case, however, is distinguishable on its facts.

---

[21] We note that no mention is made of a Dr. Yermanos in Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6.

[22] Remarkably, Dr. Yermanos apparently admitted to petitioner that he, i.e., Dr. Yermanos, had not been successful in convincing anyone to enter the field of jojoba.

In Krause v. Commissioner, supra, we held for the taxpayers on the issue of negligence. We did so in the context of oil recovery technology based on special or unusual circumstances related to the energy and oil crisis of the late 1970s and early 1980s:

> In evaluating the imposition of the additions to tax in this case, and in light of the above facts (encouraging investments in and the development of tertiary oil recovery methods such as [enhanced oil recovery] technology), we are somewhat understanding of the individual investments that were made in * * * Partnerships. In the context of the hysteria relating to the energy crisis, the oil price increases of the late 1970s, the industry and the governmental interest in [enhanced oil recovery] technology, the heavy and sophisticated promotion of these investments * * * we conclude that petitioners are not liable for the additions to tax and the additional interest element for negligence under sections 6653(a), 6653(a)(1) and (2). [Id. at 178.]

None of the circumstances that were determinative in Krause v. Commissioner, supra, are present in the case at bar. Petitioner's reliance on the cited case is misplaced.

In view of the foregoing, we hold that petitioner is liable for the additions to tax under section 6653(a)(1) and (2) for negligence. Respondent's determination is sustained.

II. Section 6661(a) Substantial Understatement of Tax Liability

The second issue for decision is whether petitioner is liable for an addition to tax under section 6661(a). That section, as amended by the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002, 100 Stat. 1951, provides for an

addition to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Petitioner bears the burden of proving that he is not liable for the addition to tax. Monahan v. Commissioner, 109 T.C. 235, 257 (1997); Mueller v. Commissioner, T.C. Memo. 2001-178.[23]

A substantial understatement of income tax exists if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return, or $5,000. Sec. 6661(b)(1)(A). Generally, the amount of an understatement is reduced by the portion of the understatement that the taxpayer shows is attributable to either (1) the tax treatment of any item for which there was substantial authority or (2) the tax treatment of any item with respect to which the relevant facts were adequately disclosed on the return. See sec. 6661(b)(2)(B).

Substantial authority exists when "the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary positions." Sec. 1.6661-3(b)(1), Income Tax Regs. Adequate disclosure of the tax treatment of a particular item may be made either in a statement attached to the return or on the return itself. Sec. 1.6661-4(b) and (c), Income Tax Regs.

If an understatement is attributable to a tax shelter item, then different standards apply. First, in addition to showing

---

[23] See supra note 16.

the existence of substantial authority, a taxpayer must show that he or she reasonably believed that the tax treatment claimed was more likely than not the proper treatment. Sec. 6661(b)(2)(C)(i)(II). Second, disclosure, whether or not adequate, will not reduce the amount of the understatement. Sec. 6661(b)(2)(C)(i)(I).

Petitioner appears to concede that there was a substantial understatement of tax within the meaning of section 6661(a).[24] Petitioner does not contend, however, that there was substantial authority supporting the deduction of the partnership loss that he claimed on his return, nor does petitioner contend that there was adequate disclosure of the facts related to that loss. Rather, petitioner contends that he should be absolved of liability for the addition to tax by virtue of section 6661(c).

Section 6661(c) vests the Commissioner with discretion to waive the addition to tax under section 6661(a) if the taxpayer shows that he or she acted with reasonable cause and in good faith. The Commissioner's failure to waive the addition to tax is reviewed by this Court for abuse of discretion. Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 235 (1998).

---

[24] We note that the understatement of tax on which respondent determined the addition to tax is $13,710. The amount required to be shown as tax on petitioner's return is $41,080. The understatement is therefore "substantial" because it exceeds the greater of 10 percent of the amount required to be shown on the return, or $5,000. Sec. 6661(a).

There is nothing in the record to suggest that petitioner ever requested that respondent waive the addition to tax under section 6661(a).  Indeed, petitioner does not even allege that he requested such a waiver.  For that reason alone, petitioner is not entitled to relief from liability.  See McCoy Enters., Inc. v. Commissioner, 58 F.3d 557, 563-564 (10th Cir. 1995), affg. T.C. Memo. 1992-693; Klieger v. Commissioner, T.C. Memo. 1992-734; sec. 1.6661-6, Income Tax Regs.

Even if petitioner had requested a waiver under section 6661(c), the record demonstrates that he failed to act reasonably and in good faith in deducting his claimed loss from San Nicholas.  As general partner and tax matters partner of four other jojoba partnerships, specifically including Utah Jojoba, petitioner was aware, or should have been aware, that San Nicholas was not engaged in the research and development of jojoba.  Accordingly, petitioner knew, or should have known, that in the absence of any research and development, there could be no deduction for research and experimental expenditures under section 174.

In view of the foregoing, we hold that petitioner is liable for the addition to tax under section 6661(a) for substantial understatement of tax liability.  Respondent's determination is sustained.

III.  Conclusion

To reflect our disposition of the disputed issues, as well as the parties' concessions, see <u>supra</u> note 1,

<u>Decision will be entered for petitioner Debra C. Kellen and for respondent as to petitioner William G. Kellen</u>.