T.C. Memo. 2002-56


UNITED STATES TAX COURT


ANTHONY N. AND MARIE M. FINAZZO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5727-00.                    Filed February 27, 2002.


<u>Robert S. Schriebman</u> and <u>Patrick E. McGinnis</u>, for
petitioners.

<u>Timothy S. Sinnott</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


ARMEN, <u>Special Trial Judge</u>:  In a so-called affected items
notice of deficiency, respondent determined additions to tax to
petitioners' Federal income tax for the year and in the amounts
as shown below:

| | Additions to Tax | | |
|---|---|---|---|
| | Sec.[1] | Sec. | Sec. |
| Year | 6653(a)(1) | 6653(a)(2) | [3]6661 |
| 1983 | $618 | [2]$12,355 | $3,089 |

[1] Throughout this opinion and unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue.

[2] The first page of the notice of deficiency mistakenly equates the amount of this addition to tax with the amount of the deficiency in income tax (see infra, subdivision "I" of the Findings of Fact). Prior to trial, respondent amended his answer to claim an increased addition to tax pursuant to sec. 6214(a). The increase, in the amount of $17,877, is purely computational in nature.

[3] The first page of the notice of deficiency mistakenly references sec. 6662(d), which section is the successor to sec. 6661 and is applicable for returns the due date for which (determined without regard to extensions) is after December 31, 1989. See Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7721(a), (c)(2), (d), 103 Stat. 2395-2400.

After a concession by petitioners,[1] the issues for decision are as follows:

(1) Whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of rules or regulations. We hold that petitioners are liable for such additions.

(2) Whether petitioners are liable for the addition to tax under section 6661 for substantial understatement of tax liability. We hold that petitioners are liable for such

---

[1] Petitioners concede that the notice of deficiency is valid. Cf. Scar v. Commissioner, 814 F.2d 1363 (9th Cir. 1987), revg. 81 T.C. 855 (1983).

addition.

The foregoing two issues relate to the participation of Anthony N. Finazzo (petitioner) as a limited partner in a jojoba partnership known as San Nicholas Research, Ltd.

FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found. The stipulated facts and attached exhibits are incorporated herein by this reference.

Petitioners resided in Fontana, California, at the time that their petition was filed with the Court.

A. Petitioners' Background and Experience

Petitioner graduated in 1953 from Chaffey Junior College in Ontario, California, with an associate of arts degree. He then attended the University of California at Los Angeles for 1 year where he took basic courses in business administration, including accounting, economics, and investing. Petitioner never took courses in either Federal or State taxation, nor did he ever take courses related to either farming or agriculture.

Petitioner is a successful businessman. Prior to 1983, petitioner served for 11 years as chairman of the board of directors of Fontana First National Bank; he also served as branch manager for several other financial institutions. In 1983, the taxable year in issue, petitioner was the general manager and 25-percent owner of Midway Honda-GMC Inc., a highly

profitable automobile and truck dealership. In July 1983, petitioner sold his ownership interest in the dealership and later became executive vice president of Monitor Dynamics, a corporation specializing in electronic security systems for both civilian and military use.

During the year in issue, petitioner Marie M. Finazzo was employed by the Fontana Unified School District as secretary for the budget commission.

In 1983, petitioner was financially well off and sophisticated. For that year, he received compensation from Midway Honda-GMC, Inc. in the amount of $170,085, gain from the sale of stock in the dealership in the amount of $245,160, and interest in the amount of $8,445. In addition, petitioner had equity interests in: (1) A partnership known as Fontana Bancorp Development; (2) a partnership known as Carousel Video; (3) San Nicholas Research, Ltd. (see infra "C" through "F"); and (4) an S corporation known as Classic Touch, Inc., that manufactured convertible tops for automobiles in Palm Springs, California.

B. Petitioner's Friend and Associate William G. Kellen

William G. Kellen (Mr. Kellen) was petitioner's close personal friend and business associate.

Mr. Kellen was a general partner and tax matters partner of four limited jojoba partnerships: Utah Jojoba Research, Ltd. (Utah Jojoba); Blythe Jojoba I Research, Ltd. (Blythe Jojoba I);

Blythe Jojoba II Research, Ltd. (Blythe Jojoba II); and Desert Center Jojoba Research, Ltd. (Desert Center Jojoba). Each of these partnerships was similar, if not identical, to San Nicholas Research, Ltd., described _infra_ in "C" through "F".

Prior to 1982, Mr. Kellen did not have any experience in growing jojoba, nor did he have any experience in either the research or development of jojoba. Prior to 1982, Mr. Kellen's knowledge concerning jojoba was limited to articles that he had read in various magazines and a general familiarity with the existence of an experimental jojoba plantation located at the University of California at Riverside.

In 1983, Mr. Kellen was actively engaged in the practice of law, specializing in the formation of financial institutions such as banks, savings and loan associations, and thrift and loan associations. Mr. Kellen did not have any expertise in accounting or tax matters, nor did he ever attempt to render advice on those subjects.

C. Petitioner's Investment in San Nicholas Research, Ltd.

Petitioner was introduced to jojoba in the fall of 1983 by Mr. Kellen, who provided petitioner with a copy of a private placement memorandum dated October 10, 1983 (see _infra_ "D" and "F") for San Nicholas Research, Ltd. (San Nicholas or the partnership). Thereafter, on December 29, 1983, petitioner signed a subscription agreement and purchased 10 limited

partnership units (a 7.8-percentage interest) in San Nicholas.[2]

The general partner and tax matters partner of San Nicholas was Alfred M. Clancy, an individual whom petitioner did not know, nor whom he had ever met, at the time that he invested in San Nicholas.

Petitioner purchased the partnership units pursuant to the aforementioned private placement memorandum. Petitioner paid $2,790 per limited partnership unit, or a total of $27,900, for his 10 units in San Nicholas. Of this amount, $1,140 per unit, or $11,400 for 10 units, was paid in cash. The balance, $1,650 per unit or $16,500 for 10 units, was payable pursuant to a 10-year promissory note.[3]

Prior to investing in San Nicholas, petitioner did not have any expertise in either farming or agriculture in general or jojoba in particular, nor did petitioner have any expertise in the area of research and development.

---

[2] The parties stipulated that petitioners acquired the partnership interest in San Nicholas. However, at trial, the parties proceeded as if petitioner himself was the only one who had acquired the partnership interest. Our findings of fact reflect the approach taken by the parties at trial. We hasten to add that if we had taken the other approach, our decision in this case would not have been different in any regard. We also hasten to add that petitioners expressly declined to raise any issue under sec. 6015.

[3] The note, which was recourse in form, contemplated payments of interest only for the first 5 years. As matters actually transpired, in 1989, the limited partners were given the option of paying a steeply discounted percentage of the principal in cash. Petitioner elected this option.

Prior to investing in San Nicholas, petitioner did not consult any expert in either farming or agriculture or jojoba, nor did petitioner consult any expert in research and development.

Prior to investing in San Nicholas, petitioner did not consult any attorney or accountant.[4]

Prior to investing in San Nicholas, petitioner did not visit the plantation site, nor did he know where it was located.

Petitioner was influenced to invest in San Nicholas by the fact that Mr. Kellen, his friend and business associate, had done so.[5] Indeed, prior to investing, petitioner spoke with no individual other than Mr. Kellen. Petitioner was also influenced to invest by his belief that an investment in San Nicholas offered tax benefits.

---

[4] Although Mr. Kellen was an attorney, he never rendered any legal advice to petitioner concerning either San Nicholas or the advisability of investing therein. Indeed, petitioner never consulted Mr. Kellen in his capacity as an attorney; rather, petitioner consulted Mr. Kellen solely as a friend and business associate.

In addition, although petitioner may have shown the private placement memorandum dated Oct. 10, 1983, see infra "D" and "F", to his accountant and return preparer Lloyd Maryanov, see infra "G", petitioner only did so after investing in San Nicholas.

[5] Mr. Kellen's investment in San Nicholas also culminated in a case in this Court. See Kellen v. Commissioner, T.C. Memo. 2002-19; see also Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6, discussed infra in subdivision "I" of the Findings of Fact, regarding Mr. Kellen's involvement in another jojoba partnership.

D.  Putative Nature of San Nicholas' Business

According to the private placement memorandum dated October 10, 1983 (the offering memorandum), San Nicholas was formed in order "to undertake a comprehensive research and development program on the plant Simmondsia Chinesis (Jojoba)."  The offering memorandum described how this program was to be carried out:

> The Partnership will enter into a research and development contract * * * with U.S. Agri Research and Development Corp. (the "R & D Contractor"), who will conduct the experiments in various test sites * * * as well as its laboratory or greenhouse facilities that it in its sole discretion deems advisable.  In addition, the R & D Contract sets forth that a site in the vicinity of Desert Center and Blythe, California of from 30-50 acres will be delineated as the applied research site upon which all technology and improved cultivars developed on behalf of the Partnership during the term of the contract will be placed "in field." The Partnership will also have the right but not be obligated to enter into a License Agreement * * * to license to U.S. Agri Research and Development Corp. all technology developed on behalf of the Partnership for a period of forty (40) years and receive therefrom an amount equal to 85% of the products produced from the developed technology.[6]

Copies of the research and development (R&D) contract and the license agreement referred to in the preceding paragraph were attached as exhibits to the offering memorandum.  The R&D contract identified U.S. Agri Research and Development Corp.

---

[6]  Although San Nicholas may not have been obligated to enter into a license agreement with U.S. Agri Research and Development Corp., it was a foregone conclusion that it would do so.  Indeed, the research and development (R&D) contract and the license agreement were executed concurrently.  Notably, execution of the license agreement by San Nicholas served to automatically terminate the R&D contract pursuant to the terms of the latter contract.  See infra, subdivision "I" of the Findings of Fact.

(U.S. Agri) as a party to the contract and the R&D contractor thereunder. The license agreement identified U.S. Agri as a party to the contract and the licensee thereunder.

E.  U.S. Agri and Eugene Pace

As previously indicated, the offering memorandum identified U.S. Agri as the R&D contractor under the R&D contract and as the licensee under the license agreement. U.S. Agri was also the R&D contractor and the licensee for Utah Jojoba, Blythe Jojoba I, Blythe Jojoba II, and Desert Center Jojoba.

The president of U.S. Agri was Eugene Pace (Mr. Pace), who was also a member of its board of directors. Mr. Kellen also served as a member of U.S. Agri's board until he became general partner of Utah Jojoba, Blythe Jojoba I, Blythe Jojoba II, and Desert Center Jojoba in late 1982.

Mr. Pace and Mr. Kellen were close personal friends and business associates for a number of years before the formation of San Nicholas in late 1983. In contrast, neither in 1983 nor at any other time relevant to this case did petitioner ever meet Mr. Pace.

F.  Cautionary Language in the San Nicholas Offering Memorandum

The face of the offering memorandum warned, in block letters, that "THIS OFFERING INVOLVES A HIGH DEGREE OF RISK". The offering memorandum also included the following cautionary language in block letters:

PROSPECTIVE INVESTORS ARE CAUTIONED NOT TO CONSTRUE

THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT
COMMUNICATIONS AS CONSTITUTING LEGAL OR TAX ADVICE.
* * * INVESTORS ARE URGED TO CONSULT THEIR OWN COUNSEL
AS TO ALL MATTERS CONCERNING THIS INVESTMENT.

      *     *     *     *     *     *     *

THERE IS NO PUBLIC OR OTHER MARKET FOR THE UNITS, NOR
WILL SUCH MARKET DEVELOP.

      *     *     *     *     *     *     *

THE PURCHASE OF SUCH UNITS DESCRIBED IN THIS MEMORANDUM
INVOLVES A HIGH DEGREE OF RISK (SEE "RISK FACTORS") AND
SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN AFFORD THE
TOTAL LOSS OF THEIR INVESTMENT.

      *     *     *     *     *     *     *

EACH PURCHASER OF THE UNITS HEREIN SHOULD AND IS
EXPECTED TO CONSULT WITH HIS OWN TAX ADVISOR AS TO THE
TAX ASPECTS.

In addition, the offering memorandum limited the sale of partnership units to investors with a net worth (exclusive of home, furnishings, and automobiles) of at least $150,000, or investors whose net worth was at least $50,000 (exclusive of home, furnishings, and automobiles) and who anticipated that, for the taxable year of the investment, they would have gross income of at least $65,000 or taxable income, a portion of which, but for tax-advantaged investments, would be subject to Federal income tax at a marginal rate of 50 percent.

The offering memorandum included a section entitled "Risk Factors", which was the single longest section.  It began with a general warning:

The purchase of the interests offered hereby involves

> various risk factors.  Investment in the Partnership   *
> * * involves an extremely high degree of risk.
> Investors should consider carefully the various risk
> factors set forth in this and other portions of this
> Memorandum.  Investment in the Partnership is suitable
> only for persons of substantial financial means who will
> not require liquidity in the investment.  Investors must
> be prepared for the possible loss of their entire
> investment.

The offering memorandum then proceeded to discuss a number of specific, and significant, risk factors associated with an investment in San Nicholas.  Among those risks, the offering memorandum warned: (1) Research and development risks were so great that an investment in San Nicholas should be considered "highly speculative"; (2) the general partner had no previous experience in dealing in jojoba; (3) there was no structured market or distribution system for jojoba; (4) there were no facilities dedicated to the processing of jojoba; (5) commercial applications of jojoba are not extensive; (6) the general partner had not conducted any market analysis or similar studies; (7) there was no assurance of any increase in marketing or production facilities or in the demand for jojoba; (8) in the absence of any such increase, the production of jojoba might be unprofitable, regardless of any technology that might be developed by the R&D contractor; and (9) there was the likelihood of audit by the Internal Revenue Service.  Indeed, the discussion concerning the tax risks associated with an investment in San Nicholas constituted half of the section on "Risk Factors".

The offering memorandum also included projections of revenue,

cashflow, and taxable income or loss. Investors were warned, however, that those projections, which had been prepared for the general partner, had not been audited and that they should not be relied on to indicate the actual results that might be attained.

## G. Petitioners' Accountant and Return Preparer Lloyd Maryanov

Lloyd Maryanov (Mr. Maryanov), a certified public accountant and a named partner in the accounting firm of Maryanov, Madsen, Gordon & Campbell of Palm Springs, California, prepared petitioners' income tax return for 1983. In preparing petitioners' return, Mr. Maryanov relied on the Schedule K-1 given to him by petitioner. See infra "H".

## H. Petitioners' 1983 Schedule K-1 and Income Tax Return

Petitioner received a Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., from San Nicholas for 1983. The Schedule K-1 reported that petitioner's distributive share of partnership loss from San Nicholas was $24,710 for the year.

Petitioners timely filed a joint Federal income tax return, Form 1040, for 1983. Petitioners attached to their return page 2 of Schedule E, Supplemental Income and Loss, and claimed thereon a loss from San Nicholas in the amount of $24,710. Petitioners then offset this loss against their other income. See supra "A".

## I. Jojoba Partnership Litigation

San Nicholas was examined by the Internal Revenue Service,

and a notice of final partnership administrative adjustment, FPAA, was ultimately issued to the partnership. In December 1991, Alfred M. Clancy (Mr. Clancy), the general partner and tax matters partner of San Nicholas, commenced a TEFRA partnership proceeding in this Court.[7] Subsequently, in November 1993, Mr. Clancy and the Commissioner agreed to be bound by the decision to be entered in Utah Jojoba I Research v. Commissioner, docket No. 7619-90, a TEFRA partnership proceeding involving Utah Jojoba that had commenced by Mr. Kellen in his capacity as tax matters partner of that partnership.

In Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6, the Court made detailed findings of fact related to the jojoba limited partnerships,[8] Mr. Kellen, U.S. Agri, and Mr. Pace. The Court described the R&D contract between the partnerships and U.S. Agri as "mere window dressing" and held that the partnerships did not, directly or indirectly, engage in research or experimentation and that the partnerships lacked a realistic prospect of entering into a trade or business. In upholding the Commissioner's

---

[7] The TEFRA partnership proceeding was assigned docket No. 29994-91. TEFRA stands for the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324. See secs. 6221-6232; N.C.F. Energy Partners v. Commissioner, 89 T.C. 741, 744 (1987); Maxwell v. Commissioner, 87 T.C. 783, 789 (1986).

[8] At least 18 docketed cases were bound by stipulation to the outcome of Utah Jojoba I Research v. Commissioner, docket No. 7619-90.

disallowance of research and experimental expenditures, the Court concluded that the agreements between the partnerships and the R&D contractor (U.S. Agri) had been designed and entered into solely to provide a mechanism to disguise the capital contributions of limited partners as currently deductible expenditures.[9]  The Court stated that the activities of the partnerships were "another example of efforts by promoters and investors in the early 1980s to reduce the cost of commencing and engaging in the farming of jojoba by claiming, inaccurately, that capital expenditures in jojoba plantations might be treated as research or experimental expenditures for purposes of claiming deductions under section 174." Id.

In November 1998, Mr. Clancy, acting in his capacity as tax matters partner of San Nicholas, consented to entry of decision against the partnership.  Subsequently, in December 1998, the Court entered decision against San Nicholas pursuant to the Commissioner's Motion for Entry of Decision under Rule 248(a).[10] Thereafter, the Commissioner assessed a deficiency in petitioners' income tax for 1983 in the amount of $12,355 and mailed a so-called affected items notice of deficiency to petitioners

---

[9] In other words, in order to decrease the limited partners' cost of investing in the jojoba partnerships, large upfront deductions were manufactured from expenditures that were actually capital contributions.

[10] All Rule references are to the Tax Court Rules of Practice and Procedure.

determining additions to tax for negligence and substantial understatement of tax liability. See sec. 6230(a); N.C.F. Energy Partners v. Commissioner, 89 T.C. 741, 744 (1987); Maxwell v. Commissioner, 87 T.C. 783, 792 n.9 (1986). It is those additions to tax that are in issue in the present case.

J. Epilogue: Demise of the Jojoba Partnerships

The jojoba partnerships proved to be financial failures. In October 1991, some 30 to 40 jojoba partnerships under contract with U.S. Agri were consolidated into one large limited partnership, Jojoba Plantation Ltd. Sometime thereafter, Jojoba Plantation Ltd. filed a petition in bankruptcy under chapter 7 of the Bankruptcy Act. See Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6.

At trial, petitioners' witness, Mr. Kellen, testified that the jojoba partnerships failed because of the Internal Revenue Service. At a previous trial, Mr. Kellen testified that "the collapse, basically, of the tax incentive for doing jojoba" contributed to the partnerships' failure. Id.

- 16 -

OPINION

We have decided many jojoba cases involving additions to tax for negligence and substantial understatement of tax liability.[11] We have found the taxpayers liable for additions to tax for negligence in all of those cases; likewise, we have found the taxpayers liable for the addition to tax for substantial understatement of tax liability in all of those cases that have presented that issue.

## I.  Section 6653(a)(1) and (2) Negligence

The first issue for decision is whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) with respect to the underpayment of tax attributable to petitioner's investment in San Nicholas.  Petitioners bear the burden of proof to show that they are not liable for these additions to tax.[12]

---

[11] See, e.g., Kellen v. Commissioner, T.C. Memo. 2002-19; Lopez v. Commissioner, T.C. Memo. 2001-278; Christensen v. Commissioner, T.C. Memo. 2001-185; Serfustini v. Commissioner, T.C. Memo. 2001-183; Carmena v. Commissioner, T.C. Memo. 2001-177; Nilsen v. Commissioner, T.C. Memo. 2001-163; Ruggiero v. Commissioner, T.C. Memo. 2001-162; Robnett v. Commissioner, T.C. Memo. 2001-17; Harvey v. Commissioner, T.C. Memo. 2001-16; Hunt v. Commissioner, T.C. Memo. 2001-15; Fawson v. Commissioner, T.C. Memo. 2000-195; Downs v. Commissioner, T.C. Memo. 2000-155; Glassley v. Commissioner, T.C. Memo. 1996-206; Stankevich v. Commissioner, T.C. Memo. 1992-458.

[12] It must be acknowledged that respondent bears the burden of proof to show that petitioners are liable for the increase in the addition to tax under sec. 6653(a)(2).  Rule 142(a); see supra, p. 2, table, note 2.  However, in the present case, the increase is purely computational in nature, and respondent has convincingly demonstrated the proper amount of the addition to tax.  Accordingly, our analysis proceeds on the basis that

(continued...)

See Addington v. Commissioner, 205 F.3d 54, 58 (2d Cir. 2000), affg. Sann v. Commissioner, T.C. Memo. 1997-259; Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972); Anderson v. Commissioner, T.C. Memo. 1993-607, affd. 62 F.3d 1266 (10th Cir. 1995). See generally Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933).[13]

Section 6653(a)(1) imposes an addition to tax in an amount equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes another addition to tax in an amount equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would exercise under like circumstances. See Anderson v. Commissioner, 62 F.3d 1266, 1271 (10th Cir. 1995), affg. T.C. Memo. 1993-607; Neely v. Commissioner, 85 T.C. 934, 947 (1985). The focus of inquiry is

_____

[12](...continued)
petitioners bear the burden of proof regarding their liability for this addition to tax. In any event, we would resolve this issue for respondent based on a preponderance of the evidence.

[13] Cf. sec. 7491(c), effective for court proceedings arising in connection with examinations commencing after July 22, 1998. In the present case, the examination of petitioners' income tax return for 1983 commenced well before July 22, 1998.

the reasonableness of the taxpayer's actions in light of the taxpayer's experience and the nature of the investment. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973); see also Sacks v. Commissioner, 82 F.3d 918, 920 (9th Cir. 1996) (whether a taxpayer is negligent in claiming a tax deduction "depends upon both the legitimacy of the underlying investment, and due care in the claiming of the deduction."), affg. T.C. Memo. 1994-217; Turner v. Commissioner, T.C. Memo. 1995-363. In this regard, the determination of negligence is highly factual.

Under some circumstances, a taxpayer may avoid liability for negligence if reasonable reliance on a competent professional adviser is shown. See United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on another issue 501 U.S. 868 (1991). However, reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. See Freytag v. Commissioner, supra. For reliance on professional advice to excuse a taxpayer from negligence, the taxpayer must show that the professional had the requisite expertise, as well as knowledge of the pertinent facts, to provide informed advice on the subject matter. See David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, 39 F.3d 402, 407 (2d

Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra.

The facts pertinent to the present case relating to the structure, formation, and operation of San Nicholas are as found above and as discussed in Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6. The offering memorandum identified U.S. Agri as the contractor under the R&D contract. In addition, a license agreement between San Nicholas and U.S. Agri granted U.S. Agri the exclusive right to use all technology developed for the partnership for 40 years in exchange for a royalty of 85 percent of the products produced from such technology. The R&D contract and the license agreement were executed concurrently.

According to its terms, the R&D contract expired upon the partnership's execution of the license agreement. Because the two contracts were executed concurrently, amounts paid by the partnership to U.S. Agri were not paid pursuant to a valid R&D contract but rather were passive investments in a farming venture under which the investors' return, if any, was to be in the form of royalties pursuant to the license agreement. Thus, as the Court held in Utah Jojoba I Research v. Commissioner, supra, the partnership was never engaged in research or experimentation, either directly or indirectly. Moreover, the Court found that U.S. Agri's attempt to farm jojoba commercially did not constitute R&D, thereby concluding that the R&D contract was designed and

entered into solely to decrease the limited partners' cost of investing in an jojoba partnership through large, upfront deductions for expenditures that were actually capital contributions.  The Court further concluded that the partnership was not involved in a trade or business and had no realistic prospect of entering into a trade or business with respect to any technology that was to be developed by U.S. Agri.  Id.

Notwithstanding the foregoing, petitioners contend that petitioner's investment in San Nicholas was motivated solely by the potential to earn a profit.  Petitioners also contend that, taking into account petitioner's experiences as a successful businessman and the nature of petitioner's investment, petitioner exercised the due care that a reasonable and ordinarily prudent person would have exercised under like circumstances.  Finally, petitioners contend that reliance on Mr. Kellen, Mr. Pace, a professor at the University of California, and Mr. Maryanov should absolve petitioners of liability for negligence in this case.  For the following reasons, we disagree with petitioners' contentions.

First, the principal flaw in the structure of San Nicholas was evident from an examination of the R&D contract and the license agreement.  Both of these documents were a part of the offering memorandum.  A reading of the R&D contract and the

license agreement demonstrates that the license agreement canceled, or rendered ineffective, the R&D contract because of the concurrent execution of the two documents. Accordingly, San Nicholas was never engaged in, either directly or indirectly, any research or experimentation. Rather, San Nicholas was merely a passive investor seeking royalty returns pursuant to the license agreement. See Kellen v. Commissioner, T.C. Memo. 2002-19; Lopez v. Commissioner, T.C. Memo. 2001-278; Christensen v. Commissioner, T.C. Memo. 2001-185; Serfustini v. Commissioner, T.C. Memo. 2001-183; Carmena v. Commissioner, T.C. Memo. 2001-177; Nilsen v. Commissioner, T.C. Memo. 2001-163; Fawson v. Commissioner, T.C. Memo. 2000-195. Any experienced attorney capable of reading and understanding the subject documents should have understood the legal ramifications of the licensing agreement's canceling the R&D agreement. Petitioner failed to consult an attorney and, further, failed to carefully scrutinize the offering himself.

Second, we are unable to accept uncritically petitioners' contention that petitioner invested in San Nicholas solely to earn a profit.[14] Rather, at the time that petitioner signed the

---

[14] It is the duty of the Court to listen to testimony, observe the demeanor of witnesses, weigh the evidence, and determine what to believe. The Court is not required to accept testimony at face value, and the Court may discount a party's self-interested testimony and place reliance on other evidence that is believed to be more reliable. See Christensen v.

(continued...)

subscription agreement, he believed that his investment in San Nicholas offered tax benefits, and his decision to invest was influenced, in part, by that belief.

Third, we do not think that petitioner, a sophisticated investor, exercised due care at the time that he signed the subscription agreement.  In this regard we are again unable to accept uncritically petitioners' contention that petitioner reasonably relied on the offering memorandum.  The short answer to this contention is that petitioner either did not read the offering memorandum in its entirety or chose to ignore portions thereof.  See Goldman v. Commissioner, supra at 407-408, holding that the taxpayer's reliance on offering materials was not reasonable; see also Pasternak v. Commissioner, 990 F.2d 893, 903 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181, holding that claims that are probably "too good to be true" should be investigated by a reasonably prudent person.[15]

The offering memorandum was replete with caveats and warnings regarding the business and tax risks associated with an investment

---

[14](...continued)
Commissioner, 786 F.2d 1382, 1383-1384 (9th Cir. 1986), affg. in part and remanding in part T.C. Memo. 1984-197; Niedringhaus v. Commissioner, 99 T.C. 202, 212 (1992); Duralia v. Commissioner, T.C. Memo. 1994-269; see also Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

[15] In the present case, the parties stipulated to a promotional videotape produced by U.S. Agri that described jojoba as "liquid gold" and "the industrial crop of the future", which would be cultivated in "some of the most hostile land anywhere".

in San Nicholas.  The cover page cautioned that "THIS OFFERING INVOLVES A HIGH DEGREE OF RISK" and warned prospective investors "NOT TO CONSTRUE THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS AS CONSTITUTING LEGAL OR TAX ADVICE."  Potential inventors were urged "TO CONSULT THEIR OWN COUNSEL AS TO ALL MATTERS CONCERNING THIS INVESTMENT" and were advised "TO CONSULT WITH [THEIR] OWN TAX ADVISOR AS TO THE TAX ASPECTS."  The single longest section of the offering memorandum was devoted to "risk factors" and warned of numerous risks, specifically including tax risks, the lack of a structured market and distribution system for jojoba, and the highly speculative nature of the investment. Petitioner ignored these warnings, reasoning that "for the amount of investment that I made here, I didn't think it was necessary to go hire an attorney to find out if this was * * * legitimate".[16]

---

[16] In the alternative, petitioners assert that petitioner did in fact consult an attorney; i.e., Mr. Kellen.  However, there is simply nothing in the record to suggest that petitioner ever questioned Mr. Kellen concerning the details of San Nicholas or that petitioner ever compensated Mr. Kellen for whatever advice may have been rendered.  More to the point, the record is clear that petitioner consulted Mr. Kellen not as an attorney but rather as a close personal friend and business associate.

On brief, petitioners painstakingly attempt to dissect portions of the offering memorandum in an attempt to show that petitioner carefully perused what he calls a "business plan". Petitioners' piecemeal approach to the offering memorandum ignores the existence of the strong cautionary language. A careful review of the offering memorandum, especially the portion discussing the tax risks, would have caused a prudent investor to question the propriety of the tax benefits. We would certainly expect no less from a sophisticated businessman such as petitioner.[17]

Fourth, petitioners contend that reliance on Mr. Kellen, Mr. Pace, a professor at the University of California, and Mr. Maryanov should absolve petitioners of liability for negligence in this case. We disagree that any such reliance was reasonable; rather, the record demonstrates that petitioners failed to obtain competent, independent, professional advice before investing in San Nicholas.

Petitioners contend that petitioner reasonably relied on advice from Mr. Kellen. In this regard petitioners argue that Mr. Kellen was qualified as an expert in jojoba and that he (i.e., Mr. Kellen) conducted an extensive "analysis" of San Nicholas. However, the record establishes that Mr. Kellen only became

---

[17] We find it curious that petitioners would emphasize petitioner's significant business experience as evidence of due care. To the contrary, petitioner's significant business experience should have caused petitioner to delve deeper into the nature of his investment.

involved in the farming of jojoba in or about 1982, so his experience was limited, and there is nothing to suggest that he was knowledgeable about research and development of jojoba. See Kellen v. Commissioner, T.C. Memo. 2002-19; see also Freytag v. Commissioner, 89 T.C. at 888. Further, we have found that Mr. Kellen's "analysis" of San Nicholas was not based on anything other than the projections set forth in the offering memorandum. Kellen v. Commissioner, supra; see Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

The record also establishes that Mr. Kellen was the general partner and tax matters partner of four other jojoba partnerships, including Utah Jojoba. See supra "B". Mr. Kellen was also the close personal friend and business associate of Mr. Pace, the president (and a director) of U.S. Agri, which was the R&D contractor and licensee of San Nicholas and other jojoba partnerships. Indeed, at one time, Mr. Kellen was also a director of U.S. Agri. Accordingly, any advice that Mr. Kellen may have given can be analogized to that of an insider or promoter, which advice is inherently suspect. E.g., Addington v. Commissioner, 205 F.3d at 59; Pasternak v. Commissioner, 990 F.2d at 903.

In Glassley v. Commissioner, T.C. Memo. 1996-206, we found that the taxpayers:

> acted on their fascination with the idea of
> participating in a jojoba farming venture and their

> satisfaction with tax benefits of expensing their investments, which were clear to them from the promoter's presentation. They passed the offering circular by their accountants for a "glance" * * *.

The record in the present case suggests that whatever advice Mr. Kellen may have given was nothing more than a generalized affirmation to invest in jojoba. Indeed, at trial, petitioner testified as follows:

> Bill was probably a major influence on our investment with jojoba. You know, Bill was very excited about it and, you know, he talked to us like a Dutch uncle, you might say. He was very, very high on the jojoba investment.

Petitioners also contend that petitioner reasonably relied on advice from Mr. Pace. The short answer to this contention is that at no time relevant to this case did petitioner ever meet Mr. Pace. But if what petitioners mean is that petitioner relied on a videotape in which Mr. Pace appeared, see supra note 15, then suffice it to say that reliance on a promotional videotape produced by the sole contractor (here, U.S. Agri) of the promoter does not constitute due care, see, e.g., Addington v. Commissioner, 205 F.3d at 59 ("It is unreasonable for taxpayers to rely on the advice of someone who they know has a conflict of interest.").

Petitioners also contend that petitioner reasonably relied on advice from a professor at the University of California at Riverside, a Dr. Yermanos, an individual whom petitioners regard

as an expert in jojoba.[18]  Yet the record demonstrates that petitioner never spoke with this individual.[19]  At best, petitioner merely visited the university and "looked at some of the documentations that Dr. Yermanos had prepared" regarding the jojoba plant.  In short, there is simply nothing in the record to indicate that this individual provided any advice to petitioner that would absolve petitioners from liability for the additions to tax for negligence.

Petitioners contend that petitioner reasonably relied on advice from Mr. Maryanov concerning the proper tax treatment of the partnership loss at the time that their 1983 tax return was to be filed.  However, this individual did not testify at trial, so we do not know first hand what knowledge or experience he may have had regarding either jojoba or the deductibility of R&D expenses, what advice he may have given, or on what basis any such advice may have been rendered.  The record establishes only that Mr. Maryanov prepared petitioners' tax return, relying on the Schedule

---

[18] We note that this individual did not testify at trial, so we know essentially nothing about him.  We also note that no mention is made of a "Dr. Yermanos" in Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6.

[19] Although Mr. Kellen may have spoken to this individual, there is nothing in the record to even suggest that this individual knew about the existence of San Nicholas, much less the details regarding the promotion.

K-1 that petitioner had received from San Nicholas.[20]

Finally, petitioners rely heavily on <u>Krause v. Commissioner</u>, 99 T.C. 132 (1992), affd. sub nom. <u>Hildebrand v. Commissioner</u>, 28 F.3d 1024 (10th Cir. 1994). That case, however, is distinguishable on its facts.

In <u>Krause v. Commissioner</u>, <u>supra</u>, we held for the taxpayers on the issue of negligence. We did so in the context of oil recovery technology based on special or unusual circumstances related to the energy and oil crisis of the late 1970s and early 1980s:

> In evaluating the imposition of the additions to tax in this case, and in light of the above facts (encouraging investments in and the development of tertiary oil recovery methods such as * * * [enhanced oil recovery] technology), we are somewhat understanding of the individual investments that were made in * * * Partnerships. In the context of the hysteria relating to the energy crisis, the oil price increases of the late 1970s, the industry and the governmental interest in * * * [enhanced oil recovery] technology, the heavy and sophisticated promotion of these investments * * * we conclude that petitioners are not liable for the additions to tax and the

---

[20] Although petitioner testified that he provided Mr. Maryanov with a copy of the offering memorandum, there is nothing in the record to indicate whether Mr. Maryanov either read or considered it before he prepared petitioners' 1983 tax return. In addition, even though, as petitioner testified, Mr. Maryanov may have been "involved with some jojoba growers in the Palm Springs area", there is nothing in the record to indicate that Mr. Maryanov was knowledgeable about the nontax aspects of the San Nicholas promotion. See <u>Barlow v. Commissioner</u>, T.C. Memo. 2000-339 ("A taxpayer may not reasonably rely on the advice of an accountant who knows nothing about the nontax business aspects of the contemplated venture.").

additional interest element for negligence under sections 6653(a), 6653(a)(1) and (2).  [Id. at 178.]

None of the circumstances that were determinative in Krause v. Commissioner, supra, are present in the instant case. Petitioners' reliance on the cited case is misplaced.

In view of the foregoing, we hold that petitioners are liable for the additions to tax under section 6653(a)(1) and (2) for negligence.  Respondent's determination is sustained.

## II.  Section 6661(a) Substantial Understatement of Tax Liability

The second issue for decision is whether petitioners are liable for an addition to tax under section 6661(a).  That section, as amended by the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002, 100 Stat. 1951, provides for an addition to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Petitioners bear the burden of proving that they are not liable for the addition to tax.  Monahan v. Commissioner, 109 T.C. 235, 257 (1997); Kellen v. Commissioner, T.C. Memo. 2002-19; Mueller v. Commissioner, T.C. Memo. 2001-178.[21]

A substantial understatement of income tax exists if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return, or $5,000.  Sec. 6661(b)(1)(A).  Generally, the amount of an understatement is

---

[21] See supra note 13.

reduced by the portion of the understatement that the taxpayer shows is attributable to either (1) the tax treatment of any item for which there was substantial authority or (2) the tax treatment of any item with respect to which the relevant facts were adequately disclosed on the return. See sec. 6661(b)(2)(B). Substantial authority exists when "the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary positions." Sec. 1.6661-3(b)(1), Income Tax Regs. Adequate disclosure of the tax treatment of a particular item may be made either in a statement attached to the return or on the return itself. Sec. 1.6661-4(b) and (c), Income Tax Regs.

If an understatement is attributable to a tax shelter item, then different standards apply. First, in addition to showing the existence of substantial authority, a taxpayer must show that he or she reasonably believed that the tax treatment claimed was more likely than not the proper treatment. Sec. 6661(b)(2)(C)(i)(II). Second, disclosure, whether or not adequate, will not reduce the amount of the understatement. Sec. 6661(b)(2)(C)(i)(I).

Petitioners appear to concede that there was a substantial understatement of income tax within the meaning of section

6661(a).[22] Petitioners do not contend, however, that there was substantial authority supporting the deduction of the partnership loss that they claimed on their return. Nor do petitioners contend that there was adequate disclosure of the facts related to that loss. Rather, petitioners contend that they should be absolved of liability for the addition to tax by virtue of section 6661(c).

Section 6661(c) vests the Commissioner with discretion to waive the addition to tax under section 6661(a) if the taxpayer shows that he or she acted with reasonable cause and in good faith. The Commissioner's failure to waive the addition to tax is reviewed by this Court for abuse of discretion. Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 235 (1998).

There is nothing in the record to suggest that petitioners ever requested that respondent waive the addition to tax under section 6661(a). Indeed, petitioners do not even allege that they requested such a waiver. For that reason alone, petitioners are not entitled to relief from liability. See McCoy Enters., Inc. v. Commissioner, 58 F.3d 557, 563-564 (10th Cir. 1995), affg. T.C. Memo. 1992-693; Kellen v. Commissioner, T.C. Memo. 2002-19;

---

[22] We note that the understatement of tax on which respondent determined the addition to tax is $12,355. The amount required to be shown as tax on petitioners' return is $103,069. The understatement is therefore "substantial" because it exceeds the greater of 10 percent of the amount required to be shown on the return, or $5,000. Sec. 6661(a).

Klieger v. Commissioner, T.C. Memo. 1992-734; sec. 1.6661-6, Income Tax Regs.

Even if petitioners had requested a waiver under section 6661(c), the record demonstrates that they failed to act reasonably and in good faith in deducting the claimed loss from San Nicholas. Petitioner's limited discussions with Mr. Kellen, a promoter of other, similar jojoba partnerships and a close personal friend and business associate of U.S. Agri's president, are insufficient to demonstrate reasonable cause and good faith. Similarly, petitioners' failure to establish the extent of any tax advice received, as well as the basis on which such advice may have been rendered, is further evidence of petitioners' lack of reasonable cause and good faith. See DePlano v. Commissioner, T.C. Memo. 1998-303.

In view of the foregoing, we hold that petitioners are liable for the addition to tax under section 6661(a) for substantial understatement of tax liability. Respondent's determination is sustained.

III.  Conclusion

To reflect our disposition of the disputed issues, as well as petitioners' concession, see <u>supra</u> note 1,

<u>Decision will be entered for respondent as to the additions to tax under sections 6653(a)(1) and 6661 as determined in the notice of deficiency and as to the addition to tax under section 6653(a)(2) as claimed in the amended answer.</u>